IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| TRUE CHEMICAL SOLUTIONS, LLC | §<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 7:18-CV-78 |
| V. | | |
| PERFORMANCE CHEMICAL COMPANY | | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE COURT:

Now comes Plaintiff, True Chemical Solutions, LLC (hereinafter "True Chemical" or "Plaintiff") and files its Original Complaint against Performance Chemical Company (hereinafter "PCC" or "Defendant"), and in support thereof would show the Court as follows:

### I.
### INTRODUCTION

1.01    Plaintiff would show that all claims of PCC's patent, U.S. Patent no. 9,834,452 ("the '452 Patent"), as identified below, is invalid.

1.02    Plaintiff would show that it does not directly or indirectly infringe, has not induced others to infringe, and does not contribute to the infringement of any valid claim of the '452 Patent.

### II.
### PARTIES

2.01    True Chemical is a limited liability company with its principal place of business located at 6214 W CR 112, Midland, TX 79706, Midland County, Texas.

2.02    Defendant PCC is a Texas corporation with its principal place of business located at 9105 I-20 Frontage, Midland, Texas 79706, Midland County, Texas.  It may be served with process by serving its registered agent, C T Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201-3136.

### III.
### JURISDICTION AND VENUE

3.01    On information and belief, PCC is the owner by assignment of the '452 Patent.  PCC's actions have raised at least a reasonable apprehension of the filing of a patent infringement lawsuit against True Chemical, resulting in an actual case or controversy between True Chemical and PCC.  The totality of circumstances results in the establishment of an actual case or controversy between True Chemical and PCC relating to the '452 Patent, as set forth below. Accordingly, this action arises under the Patent Laws of the United States, including 35 U.S.C. §§ 102, 103, 112, 271, 281, and 283-85.

3.02    This Court has jurisdiction pursuant to the provisions of 28 U.S.C. §§ 1331, 1338, 2201, and 2202.

3.03    Venue for all causes of action stated herein lies in the Western District of Texas because the act alleged in this Complaint took place, in full or in part, within the boundaries of this District and PCC has an established place of business in this District pursuant to 28 U.S.C. §1391 and 1400(b).

### IV.
### FACTUAL ALLEGATIONS

4.01    PCC is in the oil and gas chemical business.  PCC was formed as a result of the consolidation of three oil and gas chemical companies.  The consolidation occurred in the year 2009.

4.02    True Chemical is a competitor of PCC in that business.

4.03    As part of PCC's business, it delivers oil and gas chemicals to its customers for their use in their oil and gas activities.  In performing that operation, it uses equipment to deliver the chemicals to the customers in specific oil and gas applications.

4.04    PCC used a 1st Trailer to deliver oil and gas chemicals to its customers (hereinafter "1st Trailer").  The 1st Trailer had a gooseneck and delivered chemicals to PCC's customers by the use of suction hoses, pumps and discharge hoses.

4.05    The 1st Trailer contained a plurality of discharge ports, a plurality of suction ports, a plurality of pressure gauges, a plurality of valves and a plurality of back pressure valves.  The 1st Trailer functions as an Automated Water Treatment Trailer For Processing Multiple Fluids Simultaneously.

4.06    On December 5, 2017, PCC was issued a patent, defined as U.S. 9,834,452 B1 titled "Automated Water Treatment Trailer for Processing Multiple Fluids Simultaneously" (hereinafter "the '452 Patent") (attached hereto as Exhibit A).

4.07    PCC used a 2nd Trailer to deliver oil and gas chemicals to its customers (hereinafter "2nd Trailer").  The 2nd Trailer delivered chemicals to PCC's customers by the use of suction hoses, pumps and discharge hoses.  The 1st Trailer and the 2nd Trailer operate substantially as described by the '452 Patent.

4.08    The 2nd Trailer has a plurality of discharge ports, a plurality of suction ports, a plurality of pressure gauges, a plurality of valves and a plurality of back pressure valves. The 2nd Trailer functions as an Automated Water Treatment Trailer For Processing Multiple Fluids Simultaneously.

4.09    PCC used the 2nd Trailer commercially in the year 2014.

4.10    PCC used the 2nd Trailer commercially in the year 2015.

4.11     PCC used the 2nd Trailer commercially prior to April 27, 2016.

4.12     PCC used the 2nd Trailer to generate income for PCC in the year 2014.

4.13     PCC used the 2nd Trailer to generate income for PCC in the year 2015.

4.14     PCC used the 2nd Trailer to generate income for PCC prior to April 27, 2016.

4.15     PCC used the 2nd Trailer to deliver oil and gas chemicals to its customers in the year 2014.

4.16     PCC used the 2nd Trailer to deliver oil and gas chemicals to its customers in the year 2015.

4.17     PCC used the 2nd Trailer to deliver oil and gas chemicals to its customers prior to April 27, 2016.

4.18     The 1st Trailer and the 2nd Trailer deliver chemicals to PCC's customers in substantially the same way.  Both the 1st Trailer and the '452 Patent use suction lines, pumps and discharge lines in order to deliver chemicals in the application requested by PCC's customers.

4.19     PCC used the 1st Trailer prior to the time that it began to use the 2nd Trailer.

4.20     PCC used the 1st Trailer commercially prior to the time it commercially used the 2nd Trailer.

4.21     PCC used the 1st Trailer to deliver oil and gas chemicals to its customers prior to the time it used the 2nd Trailer to deliver oil and gas chemicals to its customers.

4.22     The 1st Trailer and the 2nd Trailer deliver chemicals to PCC's customers in substantially the same way.

4.23    Both the 1st Trailer and the 2nd Trailer utilize suction hoses, pumps and discharge hoses in order to deliver chemicals to PCC's customers in the application requested by the customers.

4.24    On May 3, 2017, PCC filed a lawsuit in the 142nd Judicial District Court of Midland County, Texas against True Chemical and others claiming, in part, that True Chemical and others have misappropriated trade secrets (see Exhibit B, hereinafter "State Court Action").

4.25    In the State Court Action, PCC claims that one or more of its trade secrets it accuses True Chemical of misappropriating are the subject matter of in the '452 Patent.

4.26    In the State Court Action, PCC claims that one or more of its trade secrets that True Chemical misappropriated are disclosed in the '452 Patent and were learned by the individuals who formed True Chemical during their employment with PCC.

4.27    PCC's corporate representative, Burl Fuller, has stated under oath in the State Court Action that the device represented by the '452 Patent was first used by PCC commercially in approximately January 2014.

## V.
## CONTROVERSY BETWEEN THE PARTIES

5.01    PCC filed suit against True Chemical, alleging misappropriation of trade secrets under the Texas Uniform Trade Secrets Act ("TUTSA") under Chapter 134A of the Texas Civil Practice & Remedies Code based on True Chemical making and using a fracturing trailer, *i.e.,* True Chemical's Accused Instrumentality (see State Court Action). PCC's allegations also include, breach of fiduciary duty, tortious interference with contract, tortious interference with prospective relations, business disparagement, conspiracy, and aiding and abetting and *respondeat superior.*

5.02    During discovery, PCC implicated the '452 Patent as the subject matter of a trade secret alleged under the TUTSA allegations.  As such, True Chemical, having been accused of misappropriating trade secrets embodied in the '452 patent in the State Court Action, reasonably apprehends being sued for alleged infringement of the '452 patent. PCC implicated True Chemical's Accused Instrumentality as the subject matter covered by the '452 Patent.  Given the history of litigation between the parties and the allegations involving the subject matter of the '452 patent, the totality of circumstances indicates an actual case or controversy between PCC and True Chemical.  Accordingly, True Chemical brings this suit based on an actual, substantial, and continuing justiciable controversy existing between PCC and True Chemical relating to the '452 Patent that requires a declaration of rights by this Court.

## VI.
## FIRST CLAIM FOR RELIEF
### Declaratory Judgment of No Infringement of Any Claim of the '452 Patent

6.01    True Chemical restates, realleges and incorporates by reference the allegations contained in all of the preceding and subsequent paragraphs as if fully set forth herein.

6.02    True Chemical has not infringed (literally or under the Doctrine of Equivalents), does not infringe, directly or indirectly, has not induced others to infringe, and does not contribute to the infringement, of any valid claim of the '452 Patent.

6.03    The '452 Patent contains 12 claims, including independent claim 1.  Claims 2-12 depend from independent claim 1.

6.04    True Chemical's Accused Instrumentality does not infringe any claim of the '452 patent.  Among other things:

a.      True Chemical's Accused Instrumentality does not include "a controller in communication with each pump of the plurality of pumps and a network to communicate with at least one client device for remote monitoring and control" as required by claims 1-12 of the '452 patent; and

b.      True Chemical's Accused Instrumentality does not include "l. a plurality of pressure gauges, each pressure gauge measuring discharge fluid flowing from a pump of the plurality of pumps, each pressure gauge in communication with the controller" as required by claims 1-12 of the '452 patent.

6.05    The acts described in the foregoing paragraphs create a substantial controversy of sufficient immediacy and reality to warrant a Declaratory Judgment of no infringement of any claim of the '452 Patent.

6.06    True Chemical is further entitled to judgment declaring that the use of True Chemical's Accused Instrumentality by any party, including True Chemical's customers, does infringe the '452 patent, either directly or indirectly.

6.07    Absent the requested relief, True Chemical will be harmed by the cloud created by PCC's actions.

WHEREFORE, True Chemical prays for judgment as set for the hereinafter.

## VII.
## SECOND CLAIM FOR RELIEF
### Declaratory Judgment of Invalidity of All Claims of the '452 Patent

7.01    True Chemical restates, realleges and incorporates by reference the allegations contained in all of the preceding and subsequent paragraphs as if fully set forth herein.

7.02    Each and every claim of the '452 Patent is invalid at least under 35 U.S.C. §102 and 35 U.S.C. §103 with regard to prior use of the claimed subject matter and prior art.

7.03    The acts described in the foregoing paragraphs create a substantial controversy of sufficient immediacy and reality to warrant a Declaratory Judgment of invalidity of each and every claim of the '452 Patent.

7.04    Absent the requested relief, True Chemical will be harmed by the cloud created by PCC's actions.

WHEREFORE, True Chemical prays for judgment as set for the hereinafter.

## VIII.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff True Chemical prays for the following relief:

8.01    A Declaratory Judgment that Plaintiff True Chemical does not infringe, induce infringement, or contribute to the infringement of U.S. Patent No. 9,834,452;

8.02    A Declaratory Judgment that each and every claim of U.S. Patent No. 9,834,452 is invalid;

8.03    A finding that this is an exceptional case and awarding True Chemical its reasonable costs, expenses and attorney's fees in this action; and

8.04    Granting such other and further relief as the Court in its discretion deems appropriate.

## IX.
## JURY DEMAND

9.01    Plaintiff True Chemical hereby demands a trial by jury on all issues triable to a jury as a matter of right.

Respectfully submitted,

SHAFER, DAVIS, O'LEARY & STOKER
P.O. Drawer 1552
Odessa, Texas  79760-1552
(432) 332-0893
(432) 333-5002 (fax)

  /s/ James W. Essman
JAMES W. ESSMAN
    State Bar No. 00788771
    Email:  jessman@shaferfirm.com
MILES R. NELSON
    State Bar No. 14904750
    Email:  mnelson@shaferfirm.com

and

WILLIAMS MORGAN P.C.
Jaison C. John
State Bar No. 24002351
710 N. Post Oak Rd., Suite 350
Houston, TX 77024
(713) 934-4069
(713) 934-7011 (fax)
Email:  jjohn@wmalaw.com

ATTORNEYS FOR PLAINTIFF,
TRUE CHEMICAL SOLUTIONS, LLC



US009834452B1

(12) **United States Patent**
Fuller et al.

(10) **Patent No.:**      **US 9,834,452 B1**
(45) **Date of Patent:**       **Dec. 5, 2017**

(54) **AUTOMATED WATER TREATMENT TRAILER FOR PROCESSING MULTIPLE FLUIDS SIMULTANEOUSLY**

(71) Applicant: **Performance Chemical Company,** Midland, TX (US)

(72) Inventors: **Burl Fuller,** Midland, TX (US); **Jerry Fuller,** Midland, TX (US); **Mark Clifton,** Midland, TX (US); **Jose Luna,** Midland, TX (US); **Jose Marquez,** Midland, TX (US); **Edy Redmon,** Midland, TX (US)

(73) Assignee: **Performance Chemical Company,** Midland, TX (US)

( * ) Notice:    Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/661,548**

(22) Filed:    **Jul. 27, 2017**

**Related U.S. Application Data**

(60) Provisional application No. 62/491,024, filed on Apr. 27, 2017.

(51) **Int. Cl.**
*C02F 1/00*      (2006.01)
*C02F 1/50*      (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ................ *C02F 1/008* (2013.01); *C02F 1/50* (2013.01); *C02F 1/76* (2013.01); *C02F 5/08* (2013.01); *C02F 2201/008* (2013.01); *C02F 2209/03* (2013.01); *C02F 2209/40* (2013.01); *C02F 2303/04* (2013.01)

(58) **Field of Classification Search**
CPC .... C02F 1/008; C02F 1/50; C02F 1/68; C02F 1/685; C02F 1/76; C02F 5/08; C02F 9/005; C02F 2209/40; C02F 2209/03; C02F 2201/002; C02F 2201/003; C02F 2201/005; C02F 2201/008; C02F 2201/009; C02F 2303/04; C02F 2303/08; B67D 7/28; B67D 7/302; B67D 7/74; B67D 7/741; B67D 7/743; B67D 7/76; B67D 7/78; B67D 7/84
USPC ...... 210/97, 134, 136, 137, 198.1, 241, 258, 210/749, 764; 222/22, 25, 52, 628, 129,
(Continued)

(56)        **References Cited**

U.S. PATENT DOCUMENTS

5,547,584 A * 8/1996 Capehart ................. C02F 1/008
                                                              210/241
5,741,416 A * 4/1998 Tempest, Jr. ........... C02F 1/008
                                                              210/192
(Continued)

*Primary Examiner* — Joseph Drodge
(74) *Attorney, Agent, or Firm* — Buskop Law Group, P.C.; Wendy Buskop

(57)        **ABSTRACT**

A secure automated water treatment trailer and method of inserting chemical in a pipeline, the trailer having a frame with at least one axle and a tongue, a base, a plurality of connected walls, a weather proof top engaging each of the plurality of connected walls opposite the base forming an enclosure, a pair of locking doors, a plurality of discharge ports, a plurality of suction ports, a charging port, a skid, a plurality of a controller in communication with each of the pumps and a network, a plurality of pressure gauges, a generator, a plurality of valves, and a plurality of back pressure valves. The secure automated water treatment trailer automatically processes multiple fluids simultaneously into the pipeline. Each fluid has fluid characteristics and a specific gravity.

**12 Claims, 8 Drawing Sheets**






EXHIBIT
A

**US 9,834,452 B1**

Page 2

(51) **Int. Cl.**
 *C02F 1/76*     (2006.01)
 *C02F 5/08*     (2006.01)

(58) **Field of Classification Search**
 USPC ...... 222/132, 135, 136, 145.1, 145.7, 145.8;
                137/552, 613
 See application file for complete search history.

(56)       **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,404,113 B2 * | 3/2013 | Shapiro ..................... | C02F 9/005 |
| | | | 210/182 |
| 8,720,125 B2 * | 5/2014 | Andretich ............. | F24J 2/5264 |
| | | | 296/171 |
| 2005/0016906 A1 * | 1/2005 | Gettman ............ | B01D 17/0202 |
| | | | 210/143 |
| 2006/0016825 A1 * | 1/2006 | Bauch ..................... | B65G 33/04 |
| | | | 221/124 |
| 2006/0113251 A1 * | 6/2006 | McGuire ................... | C02F 9/00 |
| | | | 210/652 |
| 2011/0000861 A1 * | 1/2011 | Hutchings .............. | C02F 1/006 |
| | | | 210/749 |
| 2013/0106191 A1 * | 5/2013 | Iovino ........................ | H02J 4/00 |
| | | | 307/72 |
| 2014/0202565 A1 * | 7/2014 | Bittner .................... | C02F 1/006 |
| | | | 137/561 R |
| 2016/0115062 A1 * | 4/2016 | Krieger ..................... | C02F 9/00 |
| | | | 210/241 |

* cited by examiner



FIGURE 1A



FIGURE 1B



FIGURE 1C



FIGURE 1D



FIGURE 2A



FIGURE 2B



FIGURE 3

FIG. 4

*200*

| CONNECTING SUCTION PORTS TO CHEMICAL TOTES USING SUCTION CONDUITS |

*204*

| PRIMING UP SUCTION CONDUITS CONNECTED TO SUCTION PORTS BY OPENING CHEMICAL TOTE VALVES CONNECTED IN SERIES TO CHEMICAL TOTES |

*208*

| PRIMING UP DISCHARGE CONDUITS CONNECTED TO DISCHARGE PORTS BY PLACING DISCHARGE CONDUITS INTO AN EMPTY BUCKET AND PRIMING EACH PUMP WITH CONNECTED SUCTION AND DISCHARGE CONDUITS WITH HYDROSTATIC PRESSURE |

*209*

| ALLOWING THE BUCKET TO PARTIALLY FILL |

*212*

| REMOVING EACH DISCHARGE CONDUIT FROM A PARTIALLY FILLED BUCKET |

*216*

| CONNECTING EACH DISCHARGE CONDUIT TO A MANIFOLD |

*220*

| SEQUENTIALLY STARTING OPERATION OF EACH PUMP AND INITIATING CHEMICAL FLOW FROM THE CHEMICAL TOTES SIMULTANEOUSLY |

*224*

| MONITORING EACH PUMP FOR FLOW RATE CHANGES, FLOW BLOCKAGES AND ELECTRICAL FAULTS |

*228*

| MODIFYING PUMP FLOW RATES WHEN PUMP FLOW RATES RISE ABOVE OR FALL BELOW PRESET LIMITS DUE TO FLOW RATE CHANGES, FLOW BLOCKAGES AND ELECTRICAL FAULTS |

*232*

| MEASURING AN AMOUNT OF CHEMICAL REMOVED FROM EACH CHEMICAL TOTE AT PRESET TIME PERIODS DURING OPERATION OF THE PUMPS |

*236*

| COMPARING REMOVED CHEMICAL FROM EACH CHEMICAL TOTE TO EXPECTED QUANTITIES OF REMOVED CHEMICAL DURING OPERATION |

US 9,834,452 B1

**1**

## AUTOMATED WATER TREATMENT TRAILER FOR PROCESSING MULTIPLE FLUIDS SIMULTANEOUSLY

### CROSS REFERENCE TO RELATED APPLICATION

The current application claims priority to and the benefit of U.S. Provisional Patent Application Ser. No. 62/491,024 filed on Apr. 27, 2017, entitled "WATER TREATMENT TRAILER FOR AUTOMATICALLY PROCESSING MULTIPLE FLUIDS SIMULTANEOUSLY". This reference is hereby incorporated in its entirety.

### FIELD

The present embodiment generally relates to an automated water treatment trailer for automatically processing multiple fluids simultaneously.

### BACKGROUND

A need exists for a mobile system for processing multiple fluids simultaneously with fluid characteristics and specific gravity.

The present embodiments meet these needs.

### BRIEF DESCRIPTION OF THE DRAWINGS

The detailed description will be better understood in conjunction with the accompanying drawings as follows:

FIG. 1A depicts the back view of an automated water treatment trailer connected to an adjacent structure according to one or more embodiments.

FIG. 1B shows a perspective view of the automated water treatment trailer according to one or more embodiments.

FIGS. 1C-1D depict another embodiment of the automated water treatment trailer.

FIG. 2A depicts a detail of the plurality of pumps connected to the controller according to one or more embodiments

FIG. 2B depicts a detail of a pump controller according to one or more embodiments.

FIG. 3 depicts a diagram of the trailer connected to a network for remote control of the trailer from client devices according to one or more embodiments.

FIG. 4 is a diagram of the steps of a method according to an embodiment.

The present embodiments are detailed below with reference to the listed Figures.

### DETAILED DESCRIPTION OF THE EMBODIMENTS

Before explaining the present apparatus in detail, it is to be understood that the apparatus is not limited to the particular embodiments and that it can be practiced or carried out in various ways.

Specific structural and functional details disclosed herein are not to be interpreted as limiting, but merely as a basis of the claims and as a representative basis for teaching persons having ordinary skill in the art to variously employ the present invention.

The present invention relates to an automated water treatment trailer for automatically processing multiple fluids simultaneously wherein each fluid has fluid characteristics and specific gravity.

**2**

The automated water treatment trailer that is also a secure locking trailer contains a frame with at least one axle, a tongue for connecting the frame to a tow vehicle.

The automated water treatment trailer stops casualties of operators by providing a portable shelter for the operator from sun, hailstorms, sandstorms, and lightening while in the field.

The automated water treatment trailer contains all fluids inside the trailer so that should a leak occur, the fluid is contained in the trailer and does not contact the ground causing ground contamination. The automated water treatment trailer stops environmental hazards from happening to the earth.

The automated water treatment trailer provides a safer way to pump chlorine dioxide as a liquid, and not as a highly volatile gas which is not only safer for the operators, and can prevent explosions proximate a well.

The automated water treatment trailer can also stop fires from occurring when gaseous chlorine dioxide is used, by simply having the chlorine dioxide as a liquid.

The automated water treatment trailer enables older workers to obtain shade and protection from the elements as they monitor the pumping process.

### SUMMARY OF THE INVENTION

The invention relates to a trailer that has a plurality of connected walls engaging the base are mounted to the frame.

A weather-proof top engages each of the plurality of connected walls opposite the frame forming an enclosure.

A pair of locking doors are mounted into one of the plurality of connected walls.

A plurality of discharge ports are mounted in one of the connected walls. Additionally, a plurality of suction ports equal to the quantity of discharge ports are mounted in one of the connected walls. Each suction port is connected to a chemical tote mounted on an adjacent structure.

A charging port is mounted in one of the connecting walls for charging a client device.

A skid can be mounted in the enclosure.

A plurality of pumps are mounted in the enclosure, such as to the skid, and connected in parallel.

A controller, such as a computer, is in communication with each of the pumps and a network.

The automated water treatment trailer has a plurality of pressure gauges. Each pressure gauge measures discharge fluid flowing to a pump and in communication with the controller.

A generator or other power supply is electrically connected to the plurality of pumps, the controller, and the charging port.

The automated water treatment trailer has a manifold to which is connected plurality of ball valves. Each ball valve is mounted to engage one of the plurality of suction ports. The manifold engages a water pipe.

In embodiments, the automated water treatment trailer has a plurality of back pressure valves. Each back pressure valve is mounted between one of the ball valves and a suction port. The secure locking trailer, when connected between a discharge fluid source and a water pipe, can automatically provide different fluid flows at remotely controllable pressures using fluid characteristics and specific gravity and pressure in the water pipe.

The following terms are used herein:

The term "automated" refers to a device that can run without human intervention other than start and stop.

US 9,834,452 B1

3

The term "fluid" as used herein refers to liquid chemicals or combinations of liquid and particulate that remains flowable, or combinations of liquid and gas vapor, that remains flowable as a liquid.

The term "fluid characteristic" refers to a fluid temperature, a fluid volatility, a fluid reactivity at ambient temperatures, a fluid acidity, a fluid viscosity, fluid density, surface tension, and thermal conductivity.

The term "specific gravity" refers to the ratio of the density of a fluid to the density of a reference fluid; equivalently, it is the ratio of the mass of a fluid to the mass of a reference fluid for the same given volume. Apparent specific gravity is the ratio of the weight of a volume of the fluid to the weight of an equal volume of the reference fluid.

The term "trailer" refers to a portable, moveable structure that preferably has wheels and a towable tongue and optionally may have brakes, and lights.

Turning now to the Figures, FIGS. 1A-1D depict the automated water treatment trailer 8 according to one or more embodiments.

The automated water treatment trailer 8 (shown in FIG. 1A) is connected to an adjacent structure 35, such as a secondary trailer for automatically processing multiple fluids simultaneously from a plurality of chemical totes 33a-33e contained in the adjacent structure.

In this embodiment, the additional structure 35 carries water 13 used for flushing the plurality of chemical totes 33a-33e.

Between the chemical totes 33a-33e and the automated water treatment trailer 8 are a plurality of chemical tote valves 57a through 57e.

The automated water treatment trailer 8 sucks chemicals selectively from the chemical totes to treat fluid 11 in a water pipe 60.

Each fluid 11 in a water pipe 60 is treated with chemicals from the chemical totes 33a-33e using a model that utilizes fluid characteristics and specific gravity of the fluid 11 in the water pipe 60.

The automated water treatment trailer 8 is a secure locking trailer.

The automated water treatment trailer 8 has a frame 10. The frame can be eight feet wide by sixteen feet long. Each trailer is specifically designed to be towable without need for a road permit for extra wide or extra long loads. The frame 10 can range in width from 5 feet to 8 feet. The frame can range in length from 10 feet to 16 feet.

The frame can be made from channel steel. The frame 10 can be made from square tubing that can be from two inches to three inches in width and from two inches to three inches in height with a hollow center in some embodiments. In other embodiments, the square tubing can be solid. Components of the frame can be welded together in an embodiment, or can be clamped or screwed or riveted in other embodiments.

The frame 10 can be formed from channel steel.

The frame 10 is to be of a size that is street legal, and strong enough to be pulled by a tow vehicle without a permit.

At least one axle 12a is mounted to the frame 10 and supporting the frame. The at least one axle supports a pair of tires 16a, 16b.

In embodiments, two axles 12a and 12b are depicted (see FIG. 1B). Each axle 12a and 12b has a pair of tires, with one tire mounted on either end of the axle.

The axles 12a and 12b can be of different sizes to support different weights applied to the frame.

4

In an example, an axle 12a can range in size from a single-axle to 6-axles, 13 feet 6 in high, 53 feet 0 in long.

Multiple axle trailers provide a greater weight capacity than a single axle trailers. In some cases, the trailers can have a tandem axle at the rear of the trailer. Axles are typically made from SAE grade 41xx steel

The axles may have brakes 17, which can be actuated by the tow vehicle. The brakes can be for each wheel, or for pairs of wheels. The brakes can be pneumatic, hydraulic or electronic.

In embodiments, the automated water treatment trailer 8 with lights, which can be powered and actuated by the tow vehicle, including running lights 15a, brake lights 15b, and turning lights 15c. The trailer may have clearance lights 15d. The trailer may have fender lights 15e. The lights are typically powered by the prime mover hauling the trailer, but in some cases, there may be security lights 15f on the trailer run by the on-board power supply, which can be a generator to provide security to the trailer.

The frame has a tongue 14 for connecting the frame to the tow vehicle.

The tongue 14 can be triangular shaped.

The tongue 14 can be welded to the frame.

The tongue 14 can be made from channel steel or square tubing and can be powder coated or painted. The coating or paint can be a static charge resistant material, to prevent the attraction of lightening to the tongue. In embodiments, the entire trailer can be grounded and painted with a coating that reduces static charge build up.

The tow vehicle, which is also known as a "prime mover" can be a SUV, a pick up or a similar truck for towing. The tow vehicle can be a forklift. A bobtail is typically too large, instead a smaller all-terrain vehicles (ATV) can be used to tow the trailer to a remote site.

The automated water treatment trailer is designed to be lightweight for towing, so that an ATV does not need additional larger wheels, or a larger tread, or extra braking to use while towing the trailer.

The overall automated water treatment trailer, without chemicals is contemplated to weight from one short ton to three short tons.

In embodiments, a base 20, creating a floor, can be mounted to the frame 10. Operators can stand on the base inside the trailer and monitor pumping.

The base 20 can be similar to a wall of a steel cage with a flooring material over the steel portions. An operator can safely stand on the flooring material, which can be plywood, or sheets of metal.

The base 20 can be the width of the trailer and the length of the trailer not including the tongue. In embodiments, the base can be shorter than the length of the trailer, enabling a power supply or generator to rest on the frame without being contained in the wall portion of the trailer.

In another embodiment, the base 20 can be welded over the frame.

The base 20 can be made from an explosion proof plate, such as steel plate with a thickness from one-half inch to one inch, and capable of sustaining a crash without deforming. Keeping the trailer lightweight is paramount, so keeping the base lightweight is also critical, hence a thickness of one inch or less.

The base 20, in still other embodiments, can be a rectangular frame made up of four base beams connected together with four attached side beams.

Each side beam could be attached to an intersection of two base beams at an angle of 90 degrees. Four beams connected in parallel to the base beams form a top, and the top is

US 9,834,452 B1

5

connected to each of the side beams forming a reinforced "cage" similar to a roll cage in race cars to protect the equipment inside the automated water treatment trailer in case of an accident.

In yet another embodiment, the base 20 can be a solid plate installed over the frame of the trailer, such as with bolts, enabling the top portions of the trailer to be removable and re-installable in a modular fashion depending on the needs of the customer.

The trailer has a plurality of connected walls 22a, 22b, and 22d. A fourth wall, 22c is not viewable in this Figure.

In embodiments, the connected walls 22a, 22b, and 22d can be mounted around the side beams of a base as described above.

The plurality of connected walls 22a, 22b, and 22d is solid. In embodiments, the plurality of connected walls 22a, 22b, and 22d can be made from plywood. Each wall can be the same height. It is contemplated that the walls can range in height from 6 feet to 8 feet, such as 7 feet in height.

However, in embodiments, the front wall may be a stepped configuration, providing an extension for protection, over a power supply or generator mounted external of the wall, and simultaneously providing a storage area above the generator or power supply for spare parts and tools.

The trailer has a weatherproof top 24 engaging each of the plurality of connected walls opposite the base forming an enclosure 26.

The weatherproof top 24 can be made from a solid material, such as sheet metal, wood, or a lightweight strong non-deforming polymer plastic, such polyvinyl chloride.

In another embodiment, the weatherproof top 24 can be made from ballistic material, such as ballistic grade tent material, to reduce weight of the trailer while preventing rocks and other debris from entering the enclosure.

The thickness of the weatherproof top 24 if made from a solid material is from one-fourth inch to one-half inch.

The weatherproof top 24 can be further coated with a white sealant to not only reflect heat but also provide a weathertight seal with the walls.

In embodiments, two locking doors 28a and 28b are formed in the connected walls.

The locking doors can have locking devices 79a and 79b. The locking devices can be a latch with padlock.

The locking doors 28a and 28b can be hinged, or a sliding barn-like door, and can be a metal hollow reinforced door.

In another embodiment, the locking doors 28a and 28b can be a rolling hurricane shutter that rolls up and down, and collapses into a case. The door embodiment can provide an additional lightweight feature.

The hurricane shutter embodiments, provides enormous security to equipment in the trailer when used with a solid weatherproof top. In this embodiment, the trailer can withstand up to a category 1 hurricane winds without deforming, provided the trailer is tied down securely and does not roll away.

A plurality of discharge ports 30a-30e and a plurality of suction ports 32a-32e can be mounted in the same connected wall.

The suction ports 32a-32e can be mounted on a different connected wall opposite the discharge ports 30a-30e.

In another embodiment, the suction ports and the discharge ports can be mounted to the same connected wall (see FIG. 1B).

The quantity of discharge ports 30a-30e equals the quantity of suction ports 32a-32e.

Each discharge port 30a can have a diameter from 0.25 inch to 1 inch, such as 0.5 inch.

6

Each suction port 32a is connected through the walls. Each suction port 32a can have a diameter from one-fourth inch to two inches, such as one inch.

The discharge ports 30a-30e and the suction ports 32a-32e can be threaded on an inner diameter of each port.

A hose fitting threads to each of the discharge ports 30a-30e and suction ports 32a-32e. The hose fitting threads engage a conduit that flows, in the case of the suction ports, from a chemical tote mounted on an adjacent structure. The conduit, in the case of the discharge port, connects to a manifold 89 that is mounted on a water pipe.

Each suction port 32a is connected to one of the chemical totes 33a-33e mounted on an adjacent structure 35, which is shown to be a trailer (see FIG. 1A), but could be a skid mounted unit.

A suction conduit 38a-38e is mounted between each chemical tote 33a-33e and suction port. A discharge conduit 39a-39e is mounted between each discharge port 30a-30e and the manifold 89.

The suction conduit 30a can be made from a flexible chemical hose, having an inner diameter between one-half inch and three inches.

The plurality of chemical totes 33a-33e is used for supplying chemical to the manifold 89.

For example, the chemical totes 33a-33e can include biocides, such as glutaraldehyde, sold under the brand name GLUTARAL™ among others, and acting as a disinfectant. The biocide is applied as a liquid.

Glutaraldehyde is effective against a range of microorganisms including spores.

From 25 parts per million to 300 parts per million of the biocide can be used based on the total amount of the final formulation going into the manifold.

In embodiments, other chemical totes include a scale inhibitor, such as phosphonic scale inhibitors made by Performance Chemical Company of Midland, Tex. under brand number PH-322™.

From 50 parts per million to 500 parts per million of the scale inhibitor can be used based on the total amount of the final formulation going into the manifold scale inhibitor.

In embodiments, other chemical totes include a stabilized chlorine dioxide in liquid form.

The stabilized chlorine dioxide would be used in amount from 25 ppm to 500 ppm based on the total amount of the final formulation going into the manifold.

Still other chemical totes may include corrosion inhibitors, paraffin inhibitors, clay stabilizers, hydrogen sulfide scavengers and antioxidants.

The manifold that is mounted to the water pipe and in fluid connection with the discharge ports 30a-30e, which can allows from two to five injection points into the manifold 89.

The manifold 89 can be made from 10 inch steel pipe.

The flow rate through the manifold 89 can range from one-half barrels per minute to 100 barrels per minute.

In embodiments, the automated water treatment trailer 8 has a charging port 34 mounted in one of the connecting walls for providing energy to a removable client device, such as a cell phone, a laptop or similar device. The charging port 34 can charge portable devices, such as a 110-volt connection and can charge devices with a USB connection. Multiple charging ports can be used for operators to charge their laptops and cell phones simultaneously, particularly in case of emergency, allowing continuous connectivity to a home office.

The charging port 34 can connect to the onboard power supply 50, which can be a battery bank recharged by a solar cell array.

US 9,834,452 B1

7

In another embodiment, the charging port 34 can be external to the trailer.

On top of the base 20 or the frame if no base is used, a skid 45 is installed, which can be in the shape of a table or L-shaped structure for supporting machines contained in the enclosure 26. The skid 45 can be removably fastened in the enclosure 26. The skid can be made from steel.

In embodiments, a plurality of pumps 36a-36e are installed over the skid 45.

The plurality of pumps can be connected in parallel to each other each receiving chemicals from a different chemical tote of the adjacent structure 35.

In embodiments, the trailer and the plurality of pumps 36a-36e are electrically connected to a power supply 50.

The pumping rate of each pump 36a-36e can range from 0.5 gallons per hour to 250 gallons per hour. In embodiments, the pumps 36a-36e can be remotely controlled by connecting to a cell phone of an operator. In another embodiment, the pumps can be remotely controlled by a wired pendant station, with on, off, and an ability to increase or reduce flow rates by an operator.

A controller 40 is installed in the automated water treatment trailer that is in communication with each of the pumps 36a-36e.

In embodiments, the pumps 36a-36e, controller 40 and the charging port 34 can connect to the power supply 50. The power supply can be a generator, such as a gas generator.

Also, the power supply 50 can be another portable power supply such as solar cells mounted to the outside of the enclosure connected to a battery bank mounted inside the automated water treatment trailer.

Connected to each pump 36a-36e is a pressure gauge 44a-44e.

The pressure gauges 44a-44e can measure from one psi to 350 psi as the pumps move the chemicals to the discharge port.

Exemplary pressure gauges 44a-44e can be made by Prominent Pumps of Pittsburgh, Pa.

Each pressure gauge 44a-44e measures discharge fluid flowing from the plurality of pumps.

In embodiments, the manifold 89 can be connected a plurality of valves 52a-52e that connects to discharge ports 30a-30e. Each valve 52a-52e is fluidly connected to one of the plurality of suction port 32a-32e.

Each valve 52a-52e can connect to one of a plurality of back pressure valves 54a-54e.

In an embodiment, the valve 52a-52e can be a ball valve, a check valve, a butterfly valve, a rotary valve or a three way valve.

Each back pressure valve 54a-54e is mounted between one of the valves and a suction port.

The automated water treatment trailer connects between a discharge fluid source and a water pipe to automatically provide different fluid flows at remotely controllable pressures using fluid characteristics and specific gravity and pressure in the water pipe.

FIG. 2A depicts a detail of the plurality of pumps connected to the controller which are mounted inside the trailer.

The plurality of pumps 36a-36e are connected in parallel and in this embodiment shown mounted to a skid.

In embodiments, a controller 40 is in communication with each of the pumps and further in communication bidirectionally with a network.

The controller 40 and the pumps 36a-36e are electrically connected to a power supply 50 which can be a diesel generator.

8

In embodiments, each pump 36a-36e is connected to a plurality of pressure gauges 44a-44e.

Each pump 36a-36e can have a separate pump controller 80a-80e.

The power supply 50 may connect to a plurality of surge protectors 31a-31e. The surge protectors 31a-31e can protect each pump.

The surge protector can be a General Electric surge protector for AC power surges.

FIG. 2B depicts a detail of a pump controller 80.

The pump controller 80 contains a display 82, a flow meter, 83, a pump stroke counter 84 (showing 14 strokes have been counted), a power indicator 85 which can be a light that is on, when the pump is on, an increase flow button 86, a decrease flow button 87, and an alarm indicator 88 which indicates when the pump is operating less than or greater than preset limits. The alarm indicator can be a light.

The display 82 can be a touch screen display.

The flow meter 83 quantifies bulk fluid movement. Fluid flow can be measured in a variety of ways. Positive-displacement flow meters accumulate a fixed volume of fluid and then count the number of times the volume is filled to measure flow. Other flow measurement methods rely on forces produced by the flowing stream as it overcomes a known constriction, to indirectly calculate flow. Both types of flow meters can used herein. Flow may be measured by measuring the velocity of fluid over a known area.

The pump rate of flow may be modified using the formula to convert Barrels per minute and ppm to Gallons per hour to adjust flow rate on the pump display. The formula, which is GPII=(bbls/min)*42*ppm1000000*60 establishes the correct rate to set the pump. Stroke length and stroke time also need to be set to precisely measure the correct amount of chemical/fluid pumped.

FIG. 3 depicts a diagram of the automated water treatment trailer 8 with a controller 40 powered by a power supply 50 in wireless communication with the network 42 for remote control of the trailer from client devices 99a and 99b.

The controller can further communicate with a network that further communicates with a plurality of client devices 99a and 99b for remote control, all simultaneously.

The client device 99a can be a laptop, a cell phone, a cloud based processor, a tablet, or another wearable computer.

The controller 40 can be a programmable logic circuit, or a laptop, or another portable processing device that has processor in communication with data storage that is a computer readable device with non-evanescent memory, and a display.

The controller 40 provides bidirectional communication with a network.

The network 42 can be a satellite network, a global communication network, or a cellular network.

FIG. 4 is a diagram of the steps of a method according to one or more embodiments.

The following is an exemplary method for automated treatment of water in a pipeline.

The method for automated treatment of water in a pipeline can include, but is not limited to the steps described below. The method can be utilized by a person of ordinary skill in the industry, and is not limited to a particular order or sequence.

The method involves connecting suction ports to chemical totes using suction conduits, as shown in box 200.

The method involves priming up suction conduits connected to suction ports by opening chemical tote valves connected in series to chemical totes, as shown in box 204.

US 9,834,452 B1

9

The method involves priming up discharge conduits connected to discharge ports by placing discharge conduits into an empty bucket and priming each pump with connected suction and discharge conduits with hydrostatic pressure, as shown in box 208.

The method involves allowing the bucket to partially fill, as shown in box 209.

The method involves removing each discharge conduit from a partially filled bucket, as shown in box 212.

The method involves connecting each discharge conduit to a manifold, as shown in box 216.

The method involves sequentially starting operation of each pump and initiating chemical flow from the chemical totes simultaneously, as shown in box 220.

The method involves monitoring each pump for flow rate changes, flow blockages and electrical faults as shown in box 224.

The method involves modifying pump flow rates when pump flow rates rise above or fall below preset limits due to flow rate changes, flow blockages and electrical faults, as shown in box 228.

The method involves measuring an amount of chemical removed from each chemical tote at preset time periods during operation of the pumps, as shown in box 232.

The method involves comparing removed chemical from each chemical tote to expected quantities of removed chemical during operation, as shown in box 236.

EXAMPLE—METHOD FOR USING AN
AUTOMATED WATER TREATMENT TRAILER
AND PROCESSING MULTIPLE FLUIDS
SIMULTANEOUSLY

For two fluids. The first fluid is a biocide.

The second fluid is stabilized chlorine dioxide.

The automated water treatment trailer is an 8 foot by 16 foot frame with two axles, with two tires per axle, a 3 foot long tongue for connecting the frame to a Ford F 150 pick up truck.

A base is mounted on the frame and is made from plywood creating a floor.

Four connected walls are mounted around the entire base.

A weatherproof top engages each of the plurality of connected walls opposite the base forming an enclosure that is 8 feet wide by 16 feet long by 7 feet high.

Two locking doors are used with the enclosure.

A first locking door can be mounted into the wall at the back of the automated water treatment trailer. The first door can be 6.5 feet high and 7.5 feet wide. The first locking door is hinged.

The second locking door can be mounted in a side-connected wall. The second locking door can be 6.5 feet high and 4 feet wide.

Two discharge ports 30a-30b are mounted in the same connected wall as the second door.

Two suction ports 32a-32b are mounted in same connected wall.

Each suction port connects to a chemical tote mounted on at least one adjacent structure. The suction port pulls chemicals from the chemical tote. One suction ports can connect to chlorine dioxide chemical totes and two suction ports can connect to biocide chemical totes.

A manifold is mounted to a water pipe and in fluid connection with two discharge ports. The manifold is configured to control flow fluid from the two discharge ports into a water pipe.

10

A charging port 34 is mounted in one of the connecting walls for charging simultaneously, two client devices from outside the enclosure.

Two pumps mounted in the enclosure and connected in parallel, pull chemical from the chemical totes and flow the chemical to the plurality of discharge ports simultaneously.

A controller that is a computer is in communication with each of the pumps and with a network, which in this example, is the Internet to communicate with at least one client device for remote monitoring and control.

Two pressure gauges are used to measure pressure on fluid flowing from each pump. Each pressure gauge is in communication with the controller.

A power supply that is a generator that generates AC 110 volt current electrically connects to each of the pumps, as well as the controller and the charging port.

Two valves, which in this case are ball valves, are used. Each valve fluidly engages one of the plurality of suction ports.

Two back pressure valves are used in this example. Each back pressure valve is mounted to one of the ball valves.

The automated water treatment trailer automatically provides the two different fluids at different flows by remote control and preset pressures that relate to fluid characteristics and specific gravities as well as pressure in the water pipe.

While these embodiments have been described with emphasis on the embodiments, it should be understood that within the scope of the appended claims, the embodiments might be practiced other than as specifically described herein.

What is claimed is:

1. An automated water treatment trailer for processing multiple fluids simultaneously, each fluid with a fluid characteristic and a specific gravity, the automated water treatment trailer comprising:

a. a frame with at least one axle, and a tongue for connecting the frame to a tow vehicle;

b. a base creating a floor, mounted to the frame;

c. a plurality of connected walls mounted to the base;

d. a weather-proof top engaging each of the plurality of connected walls opposite the base forming an enclosure;

e. a pair of locking doors, each door mounted into a respective one of the plurality of connected walls;

f. a plurality of discharge ports mounted in one of the connected walls;

g. a plurality of suction ports equal to the quantity of the plurality discharge ports mounted in one of the plurality of connected walls, each suction port connected to a chemical tote mounted on at least one adjacent structure for pulling chemicals from the chemical tote;

h. a manifold mounted to a water pipe and in fluid connection with the discharge ports configured to control flow fluid from the discharge ports into the water pipe;

i. at least one charging port mounted in one of the plurality of connecting walls for charging a client device from inside or outside the enclosure, wherein the charging port connects to a power supply;

j. a plurality of pumps mounted in the enclosure and connected in parallel, each pump of the plurality of pumps configured to pull chemical from a respective one of the chemical totes and flow the chemical to a respective one of the plurality of discharge ports simultaneously;

US 9,834,452 B1

11

k. a controller in communication with each pump of the plurality of pumps and a network to communicate with at least one client device for remote monitoring and control;

l. a plurality of pressure gauges, each pressure gauge measuring discharge fluid flowing from a pump of the plurality of pumps, each pressure gauge in communication with the controller;

m. a power supply electrically connected to the plurality of first pumps, the controller and the charging port;

n. a plurality of valves; each valve fluidly engaging one of the plurality of suction ports; and

o. a plurality of back pressure valves, each back pressure valve mounted to one of the first valves, wherein the automated water treatment trailer is operable for automatically providing different fluid flows at remotely controllable pressures related to fluid characteristics and specific gravity and pressure in the water pipe.

2. The automated water treatment trailer of claim 1, comprising from three to five discharge ports for simultaneously engaging the water pipe.

3. The automated water treatment trailer of claim 1, comprising a skid mounted in the enclosure for supporting the plurality of pumps above the frame.

4. The automated water treatment trailer of claim 1, wherein each chemical tote comprises a second valve to control flow of chemicals from the chemical tote to one of the pumps.

5. The automated water treatment trailer of claim 1, wherein each pump comprises a pump controller with a

12

display, a pump flow meter, a pump stroke counter, a power indicator, an increase flow button, a decrease flow button, and an alarm indicator.

6. The automated water treatment trailer of claim 1, comprising a locking device connected to each locking door for securely locking the enclosure.

7. The automated water treatment trailer of claim 1, comprising a respective surge protector mounted between the pump controller and the power supply for each pump of the plurality of pumps.

8. The automated water treatment trailer of claim 1, comprising at least one brake for each axle.

9. The automated water treatment trailer of claim 1, comprising a plurality of lights, the plurality of lights each comprising a member selected from the group: consisting of running lights, brake lights and turning lights, clearance lights, fender lights and security lights.

10. The automated water treatment trailer of claim 1, comprising a suction conduit mounted between each chemical tote and suction port.

11. The automated water treatment trailer of claim 1, comprising a discharge conduit mounted between each discharge port of the plurality of discharge ports and the manifold.

12. The automated water treatment trailer of claim 1, wherein the first valves comprise valves selected from the group consisting of a ball valve, a check valve, a butterfly valve, rotary valve, or a three way valve.

*   *   *   *   *

CV53351

Filed 5/3/2017 3:43:43 PM
Ross Bush
District Clerk
Midland County, Texas

CAUSE NO. _____

| | | |
|---|---|---|
| PERFORMANCE CHEMICAL COMPANY | § § § | IN THE DISTRICT COURT OF |
| VS. | § § | |
| TRAVIS PITCOCK, KELLY GABRIEL, TYLER HINRICHS, EUGENE SCHMIDT, DUSTIN PERRY, KEENAN KALT, ANTHON PHILLIPS AND TRUE CHEMICAL SOLUTIONS, LLC | § § § § § § § | MIDLAND COUNTY, TEXAS |

142nd JUDICIAL DISTRICT

**PLAINTIFF'S ORIGINAL VERIFIED PETITION FOR DAMAGES AND APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION**

**TO THE HONORABLE JUDGE OF THIS COURT:**

COMES NOW Performance Chemical Company ("Plaintiff" or "Performance Chemical") files this Original Petition against Defendants Travis Pitcock, Kelly Gabriel, Tyler Hinrichs, Eugene Schmidt, Dustin Perry, Kennan Kalt, Anthon Phillips ("Individual Defendants") and True Chemical Solutions, LLC ("True Chemical") (True Chemical and Individual Defendants are collectively, "Defendants"). As detailed below, the facts justify the entry of a temporary restraining order and permanent injunctions, and judgment for monetary damages against Defendants.

**I.     INTRODUCTION**

This lawsuit is filed to prevent immediate and irreparable harm to Plaintiff Performance Chemical resulting from stealing trade secrets by a direct competitor, True

1



Chemical, with the assistance of the other Defendants who were former employees of Performance Chemical.

Defendants' actions have severely damaged and continue to threaten substantial irreparable harm to Performance Chemical. Performance Chemical needs immediate injunctive relief to prevent such further violations.

## II.    DISCOVERY LEVEL/EXPEDITED DISCOVERY

1.    Discovery should be conducted under Level 3 of TEX. R. CIV. P. 190.

## III.   PARTIES

2.    Plaintiff Performance Chemical is a duly formed and existing under the laws of the State of Texas with its principal place of business in Midland County, Texas, located at 9105 I-20 Frontage, Midland, Texas 79706.

3.    Defendant Travis Pitcock is an individual who resides in Midland County and may be served with process by the Midland County Sheriff at 6400 E CR 110, Midland, TX 79706.

4.    Defendant Kelly Gabriel is an individual who resides in Midland County and may be served with process by the Midland County Sheriff at 4800 Teakwood Trace, Midland, TX 79707.

5.    Defendant Tyler Hinrichs is an individual who resides in Midland County and may be served with process by the Midland County Sheriff at 1406 East Pecan, Midland, TX 79705.

6.     Defendant Eugene Schmidt is an individual who mail be served with process by certified mail return receipt requested at 1688 Ranch Road 1631, Fredericksburg, TX 78624-6044.

7.     Defendant Dustin Perry is an individual who resides in Midland County and may be served with process by the Midland County Sheriff at 6215 W CR 112, Midland, TX 79706.

8.     Defendant Keenan Kalt is an individual who resides in Midland County and may be served with process by the Midland County Sheriff at 3100 Harvard, Midland, TX 79701.

9.     Defendant Anthon Phillips is an individual who resides in Howard County and may be served with process by the Howard County Sheriff at 1008 Richie Rd., Big Spring, TX 79720.

10.     Defendant True Chemical Solutions, LLC, is a limited liability company under the law of Delaware and registered to do business under the laws of the State of Texas, with its principal place of business at 6215 W CR 112, Midland, TX 79706 and may be served with process by certified mail return receipt requested on its Registered Agent: the C.T. Corporation System, 1999 Bryan St., Suite 900, Dallas, TX 75201-3136.

IV.    JURISDICTION AND VENUE

11.     The Court has jurisdiction over this proceeding because the amount in controversy in this litigation, excluding exemplary damages and interest, exceeds the

minimum jurisdictional limits of this Court. Further, in accordance with TEX. R.

CIV. P. 47(c), Performance Chemical seeks monetary relief over $1,000,000.

12.    Venue is proper in Midland County, Texas under TEX. CIV. PRAC. &

REM. CODE § 15.002 because (1) a substantial portion of the events that are the

basis of this lawsuit seeking injunctive relief occurred in Midland, County, Texas; (2)

Defendants Pitcock, Gabriel, Hinrichs, Perry, and Kalt are Midland County residents;

and (3) Defendant True Chemical does business in Midland County.

13.    In light of the injunctive relief requested herein, the Court also has

jurisdiction under TEX. CIV. PRAC. & REM. CODE §§ 65.021 AND 65.023.

## V.    FACTS

**Plaintiff Performance Chemical is a chemical company provider that took
reasonable steps to protect confidential information and customer
goodwill.**

14.    Performance Chemical provides chemicals and services to the oil and gas

industry in Midland County, and surrounding areas.

15.    Performance Chemical expends considerable resources in an effort to (a)

identify and solicit potential customers, (b) maintain and deepen their relationship

with existing customers, (c) market their own brand and foster customer goodwill,

and (d) train, motivate, and develop their employees. The aforementioned

information is valuable, confidential, and proprietary to Performance Chemical, and

4

is not generally known in the public domain. The information has significant economic value to Performance Chemical, and would be of significant economic value to competitors in the industry.

16.    To protect legitimate business interests with respect to the aforementioned information and the investment Performance Chemical makes in its employees, Performance Chemical limits access to its confidential information in a variety of ways. For example, Performance Chemical utilizes password protections to safeguard computer systems and data. Performance Chemical also requires employees to sign an employee handbook with confidentiality policies.

**Individual Defendants' roles as Performance Chemical's trusted management team**

17.    Pitcock, Gabriel, Schmidt and Perry worked in a high-level position of trust and confidence with Performance Chemical. They routinely met with Performance Chemical's employees and customers; they also participated at the highest level in strategic planning regarding Performance Chemical's operations and bids for customers, and routinely accessed confidential and trade secret protected information of Performance Chemical. In sum, Pitcock, Gabriel, and Hinrichs' roles were in significant management positions and had access to Performance Chemical's most confidential pricing information, methodology, and short- and long-term goals and strategies.

**Individual Defendants agreed to Performance Chemical's policies regarding confidentiality and Defendants' Agreement include confidentiality and non-solicitation covenants**

18.    Individual Defendants agreed to Performance Chemical's policies regarding its assets, records, intellectual property, computer systems, proprietary information, and confidentiality, insider information, and conflicts of interests, outside employment, and expenses.

**Individual Defendants quit and take with them Performance Chemical's trade secrets**

19.    The Defendants quit or were terminated as follows:

| Employee | Job Title | Department | Last Day Worked | Release Date |
|---|---|---|---|---|
| Phillips, Anthon | Acct. Rep-Sales | Barnhart | 04/11/2017 | 04/11/2017 |
| Gabriel, Kelly | Business Development - Sales | Midland | 01/27/2017 | 01/27/2017 |
| Schmidt, Eugene | District Manager - Sales | Midland | 01/27/2017 | 01/27/2017 |
| Perry, Dustin | District Manager - Sales | Midland | 03/27/2017 | 03/27/2017 |
| Pitcock, Travis | Regional Mgr-Sales Mgt | Midland | 03/27/2017 | 03/27/2017 |
| Kalt, Keenan | Spec Prod Div-Sales | Midland | 03/23/2017 | 03/24/2017 |
| Hinrichs, Tyler | Frac Manager | Midland | 03/23/2017 | 03/24/2017 |

**Performance Chemical will be immediately and irreparably injured before notice can be served and a hearing had**

20.    As detailed above, Individual Defendants have deep knowledge of Performance Chemical's confidential information and trade secrets. During their employment with Performance Chemical, Individual Defendants also acquired and

utilized the goodwill Performance Chemical developed with customers over many years of contact. Defendants would gain a significant and unfair business advantage if they had access, directly or indirectly, to the confidential information and trade secrets that are known to Defendant. Moreover, True Chemical would gain a significant and unfair business advantage if it is able to trade on the customer goodwill vested in Individual Defendants during their tenure with Performance Chemical. The confidential information, trade secrets, and goodwill could easily be used (and appear to actually have been used) by True Chemical to divest Performance Chemical of customers and unfairly compete with Performance Chemical for prospective customers.

21.    If Performance Chemical loses a customer to True Chemical as a result of Defendants' work with such companies, Performance Chemical may never be able to reestablish that relationship, resulting in hundreds of thousands–if not millions–of dollars in potential damages. Likewise, if, through Individual Defendants' actions, True Chemical is able to land a prospective customer that may have retained Performance Chemical but for Individual Defendants' work for True Chemical, Performance Chemical could lose out on hundreds of thousands–if not millions–of dollars in profits.

22.    Consequently, an immediate injunction, without notice to Defendants

and hearing, must be had to prevent Defendants from unlawful interference with Performance Chemical's business, Defendants from further breaching their employment agreement with Performance Chemical, protect confidential information and trade secrets, and preserve the status quo.

## VI.   CAUSES OF ACTION

23.   The preceding paragraphs are incorporated into each cause of action.

24.   All conditions precedent to filing this lawsuit and alleging the following causes of action were fulfilled.

### A.   Misappropriation of trade secrets (TUTSA) (Defendants)

25.   Upon information and belief, Defendants or their agents are in possession of Performance Chemical's Confidential Information and trade secrets and Defendants acquired knowledge of such information due to Individual Defendants' work with Performance Chemical.

26.   Upon information and belief, Defendants misappropriated and/or have threatened misappropriation of Performance Chemical's trade secrets by (A) acquisition while knowing or having reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret without Performance Chemical's express or implied consent by Defendants who: (i) used improper means to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was: (a) derived from or through a person who had utilized improper

means to acquire it; (b) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (c) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (iii) before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

27.    Upon information and belief, Defendants willfully and maliciously misappropriated and are now in a position where they can use and/or disclose Performance Chemical's trade secrets and Confidential Information in a competing business without Performance Chemical's authorization. This actual or threatened misappropriation of trade secrets is ongoing and will continue in the future. Thus, Performance Chemical was and continues to be damaged. Accordingly, Performance Chemical seeks damages and injunctive relief.

## B.    Breach of Fiduciary Duty (Individual Defendants)

28.    By virtue of Individual Defendants' positions for Performance Chemical, Individual Defendants had (a) formal fiduciary duties to Performance Chemical and (b) informal fiduciary duties arising from a moral, social, domestic, or purely personal relationship of trust and confidence. They accordingly owed Performance Chemical a duty of extreme care, loyalty, and candor. By unfairly competing, providing bid and proposal information to competitors, and wrongfully retaining, using, and/or threatening misappropriation of Performance Chemical's Confidential Information

and trade secrets while employed by Performance Chemical, one or more Individual Defendants breached such duties.  By their actions, one or more Individual Defendants benefitted and caused Performance Chemical to suffer substantial harm. Accordingly, Performance Chemical seeks damages and injunctive relief.

## C.     Tortious interference with contract

29.     Upon information and belief, one or more Defendants knew of and interfered with  agreements between Performance Chemical and its current customers, such as EXL, Resolute, Cimarex, Crownquest, and Clayton Williams.  Upon information and belief, Defendants willfully and intentionally committed acts of interference with those agreements. Those acts proximately caused actual damages or loss to Performance Chemical. Accordingly, Performance Chemical seeks damages and injunctive relief.

## D.     Tortious interference with prospective relations

30.     There was a reasonable probability that Performance Chemical would have entered into a business relationship with customers, such as the ones named above and JPE, Matador, and Cibola.  Upon information and belief, one or more Defendants intentionally interfered with those relationships, and Defendants' conduct was independently tortious or unlawful. Upon information and belief, those acts proximately caused actual damages or loss to Performance Chemical.  Accordingly, Performance Chemical seeks damages and injunctive relief.

### E.     Business disparagement

31.     Upon information and belief, the Defendants maliciously published without privilege and without Performance Chemical's consent false, misleading, and disparaging words, statements, and comments about Performance Chemical, its services, personnel, and its economic interests.

32.     Such publication by the Defendants were made with knowledge of the falsity of the words, statements, or comments or with reckless disregard for the words, statements, and comments' falsity. Such publication by the Defendants caused special damages and will continue to cause special damages to Performance Chemical. Specifically, the Defendants' publication played a substantial part in inducing workers to stop working for Performance Chemical, inducing customers stop working with Performance Chemical, or otherwise interfering with Performance Chemical's business; thus, Performance Chemical suffered special damages in the form of lost and reduced business relationships/sales.

### F.     Conspiracy (Defendants)

33.     Defendants engaged in a civil conspiracy to commit tortious interference with the business relationships between Performance Chemical and its customers and employees. Defendants also conspired to breach the Individual Defendants' fiduciary duties to Performance Chemical, to tortiously interfere with Performance Chemical's contractual and prospective relations, and to unfairly compete with Performance Chemical. There was a meeting of the minds on the object or course of action and there were one or more unlawful, overt acts.

11

34.     As a direct and proximate result of this conspiracy, Performance Chemical was damaged and will continue to suffer damage. Performance Chemical seeks damages and injunctive relief.

**G.     Aiding and Abetting and Respondeat Superior (Defendant True Chemical)**

35.     Individual Defendants committed several torts, including breach of fiduciary duty. Defendant True Chemical had knowledge that such actions by one or more Individual Defendants were improper, but intended to and did assist and encourage one or more Individual Defendants in committing these torts. Defendant True Chemical's participation, assistance, and encouragement of Individual Defendants' conduct was and is a substantial factor in causing harm to Performance Chemical.

36.     As a direct and proximate result of Defendant True Chemical's acts, Performance Chemical was damaged and will continue to suffer damage. Thus, Performance Chemical seeks damages and injunctive relief.

37.     Performance Chemical was injured as a result of torts committed by one or more Individual Defendants - each of them are employees of Defendant True Chemical. Such tort(s) was committed while one or more individual Defendants were acting in the scope of employment with True Chemical and/or as True Chemical's agents because such act(s) was within that employee's general authority, in furtherance of Defendant True Chemical's business, and for the accomplishment of the object for which the employee was hired.

12

## VII. APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION

38.     All preceding paragraphs are incorporated by reference and made a part hereof.

**Probable Right to Relief**

39.     It appears Defendants misappropriated or threaten misappropriation of Performance Chemical's trade secrets.  Thus, an injunction is proper under TEX. CIV. PRAC. & REM. CODE §134A.003.

40.     Defendants continue to use Performance Chemical's trade secrets and have caused harm to Performance Chemical, for which Performance Chemical has a probable right to relief at trial.

41.     Performance Chemical has reason to believe and does believe that Defendants have and will continue to violate their obligations to Performance Chemical.

42.     Defendant True Chemical conspired with Individual Defendants to commit wrongful acts and tortiously interfered with Performance Chemical's employment by solicit, recruit, or induce Performance Chemical's employees and/or customers to cease business with Performance Chemical and begin working with Defendant True Chemical. Defendants are unfairly competing against Performance Chemical by using the Performance Chemical's trade secrets and to recruit, solicit, and induce Performance Chemical's employees and customers to leave Performance Chemical to work for or with Defendant True Chemical. Defendant True Chemical's actions caused harm to Performance Chemical, for which Performance Chemical has a probable right to relief at trial. Performance Chemical has

13

reason to believe and does believe that Defendant True Chemical has and will continue such

unlawful activity. Accordingly, a writ of injunction is proper for any of the following

enumerated reasons in TEX. CIV. PRAC. & REM. CODE ¶ 65.011:

> (1) [Performance Chemical] is entitled to the relief demanded and all or part of the
> relief requires the restraint of some act prejudicial to [Performance Chemical];
> (2) [Defendant True Chemical] performs or is about to perform or is procuring or
> allowing the performance of an act relating to the subject of pending litigation, in
> violation of the rights of the [Performance Chemical], and the act would tend to
> render the judgment in that litigation ineffectual;
> (3) [Performance Chemical] is entitled to a writ of injunction under the principles of
> equity and the statutes of this state relating to injunctions; ....

43.    Performance Chemical is entitled to injunctive relief because it can

demonstrate a probable right to relief upon final hearing.

**Probable Injury for Which There Is No Adequate Remedy at Law**

44.    Defendants' actions will cause irreparable harm to Performance Chemical

before a trial on the merits of this action, for which Performance Chemical has no adequate

remedy at law. This irreparable harm is imminent if no injunction is issued.

45.    Performance Chemical is entitled to injunctive relief because it will suffer

probable injury which is imminent, irreparable, and for which there is no adequate remedy

at law. Defendants' direct competition with Performance Chemical by wrongfully soliciting

employees and/or customers on behalf of Defendant True Chemical, as well as True

Chemical's competition using Performance Chemical's information and mass-departed

employees, represents an imminent and immediate threat of harm to Performance Chemical.

Moreover, when a defendant possesses confidential information and trade secrets and is in

14

a position to use them-as is the case here-harm to the owner of the confidential information and trade secrets may be presumed.

**Irreparable Injury**

46.     Irreparable injury is an injury which cannot be compensated in damages, or an injury which results in damages that cannot be measured by any pecuniary standard.

47.     Defendants' conduct will cause irreparable injury to Performance Chemical. Performance Chemical has invested significant resources in cultivating customer relationships and goodwill, building a business model, developing confidential information, and training employees to use that information for the benefit of Performance Chemical. On behalf of a direct competitor, Defendants are now unfairly seeking to usurp customer relationships and goodwill that were developed on behalf of Performance Chemical. Moreover, Performance Chemical will receive no meaningful protection if True Chemical or the Individual Defendants are permitted to provide services to Performance Chemical's customers because it will inevitably result in the use or disclosure of Performance Chemical's confidential information and trade secrets.

48.     The full nature and impact Defendants' conduct will ultimately have on Performance Chemical is ongoing and difficult, if not impossible, to discern. Performance Chemical has been and will continue to be injured by Defendants' unlawful conduct in that Performance Chemical's confidential information, goodwill, competitive advantage, and customer relationships will be jeopardized, lost, or permanently and irreparably damaged should Defendants continue to unfairly compete unimpeded. These injuries to Performance

Chemical cannot readily be calculated in monetary damages or measured by any pecuniary standards.

**No Adequate Remedy at Law**

49.     Performance Chemical has no adequate remedy at law for the injury that Defendants' unlawful conduct caused and threatens to further cause.  There is simply no remedy that would give Performance Chemical complete, final, and equal relief. The full value of the damage that Defendants caused and continue to cause to Performance Chemical's operations and customer relationships is unique and irreplaceable, such that it is currently impossible to accurately measure the full extent of these damages in monetary terms. But even if monetary damages might be calculated for some portion of Performance Chemical's potential losses, the losses (and threatened losses) to Performance Chemical are likely to exceed Defendants' financial net worth or ability to pay.  Therefore, barring an immediate injunction, Performance Chemical will be unable to obtain complete relief.

50.     Plaintiff will suffer immediate and irreparable injury if injunctive relief is not immediately issued and that Plaintiff is without adequate remedy at law.  Further, the foregoing facts demonstrate that an immediate injunction, without notice to Defendants and hearing, must be had to prevent Defendants from breaching obligations to Plaintiff, prevent Defendants from improperly using Plaintiff's Confidential Information, devices/tools, formulas, systems of connected devices, methods, and processes prevent the harm described above, and preserve the status quo.  Accordingly, Plaintiff requests that a Temporary Restraining Order be issued without notice and ex parte because the verified allegations in

the Petition establish that Individual Defendants are vested with knowledge of Plaintiff's Confidential Information from their work with Plaintiff, there is actual or threatened misappropriation by Defendants, there is interference with Plaintiff's business, and that the harm to Plaintiff's business in terms of lost customers, employees, goodwill, and competitive advantage will be irreparable if not immediately enjoined. Consequently, the Court finds that there is not sufficient time to serve notice on Defendants and hold a hearing; rather, the Court must act immediately to preserve the status quo and prevent these likely, irreparable, immediate harms from occurring.

**Request for Temporary Restraining Order and Injunctive Relief**

51.     Performance Chemical asks the Court to issue a Temporary Injunction in place until a final trial on the merits; and, after trial, issue a Permanent Injunction Order; that in each instance:

a.     Enjoins Defendants True Chemical (and its officers, agents, or employees), Pitcock, Gabriel, Hinrichs, Schmidt, Perry, Kalt, and Phillips from (a) soliciting, inducing, or attempting to induce the following customers to cease doing business with Performance Chemical; or (b) providing products or services to Performance Chemical's customers.

b.     Enjoins Defendants True Chemical (and its officers, agents, or employees), Pitcock, Gabriel, Hinrichs, Schmidt, Perry, Kalt, Phillips, Gonzales, Villa(s), and Contreras from (a) soliciting, inducing, or attempting to induce any current employee of Performance Chemical to cease working in whole or in part with Performance Chemical; or (b) hiring or engaging any current Performance Chemical employee as an employee or independent contractor;

c.     Enjoins Defendants True Chemical (and its officers, agents, or employees), Pitcock, Gabriel, Hinrichs, Schmidt, Perry, Kalt, and Phillips from using or disclosing (except by Court order or Plaintiff's request) Performance Chemical's Trade Secrets and Confidential Information. "Confidential

17

Information" means: information regarding Performance Chemical's methodology; pricing information; plans regarding employees, customers, management, and operations; short- and long-term goals; strategies; operations; prospective customers; and bids for customers and prospective customers; and

d.    Enjoins Defendants True Chemical (and its officers, agents, or employees), Pitcock, Gabriel, Hinrichs, Schmidt, Perry, Kalt, and Phillips from destroying, removing, or secreting documents or records that are:

    i.    Communications sent to or from an e-mail account provided by Plaintiff or Defendant True Chemical;

    ii.    Communications mentioning or referring to Plaintiff;

    iii.    Communications between any of the Defendants;

    iv.    Communications between Defendants and Plaintiff's current employees;

    v.    Records obtained from Plaintiff;

    vi.    Records of payments from any Defendant to any former employee of Plaintiff;

    vii.    Communications sent to or from customers;

    viii.    Documents sent to or from customers;

    ix.    Bids and proposals by True Chemical to customers; and

    x.    Communication between Defendants and source of funds.

52.    Performance Chemical ultimately seeks a permanent injunction after trial on the merits maintaining the restrictions requested in subsections of the preceding paragraph.

53.    Performance Chemical is willing to post a bond to secure the issuance of such injunctive relief in a manner and amount to be determined by the Court.

## VIII. ATTORNEYS' FEES

55.    Performance Chemical was forced to retain the undersigned attorneys in connection with this matter. Performance Chemical agreed to pay the undersigned attorneys for their services. Performance Chemical asks that this Court award Performance Chemical's attorneys' fees and other costs under TEX. CIV. PRAC. & REM. CODE §38.001 AND

§134A.005.

## IX.    REQUEST FOR DISCLOSURE

56.    Defendants are requested to disclose, within fifty days of this request (or sooner by Court Order), the information and material described in TEX. R. CIV. P. 194.2.

## X.    PRAYER

For the foregoing reasons, Performance Chemical prays that Defendants be commanded to appear and answer, and that Performance Chemical be awarded the following relief, orders, and judgments from and against Defendant:

1.    A temporary restraining order for the maximum time period allowed by law, temporary injunction through trial, and permanent injunction, prohibiting True Chemical (and its officers, agents, or employees), Pitcock, Gabriel, Hinrichs, Schmidt, Perry, Kalt, and Phillips from (a) soliciting, inducing or attempting to induce the following customers to cease doing business with Performance Chemical; or (b) providing products or services to Performance Chemical customers.

2.    A temporary restraining order for the maximum time period allowed by law, temporary injunction through trial, and permanent injunction, prohibiting True Chemical (and its officers, agents, or employees), Pitcock, Gabriel, Hinrichs, Schmidt, Perry, Kalt, and Phillips from (a) soliciting, inducing or attempting to induce any current employee of Performance Chemical to cease working in whole or in part with Performance Chemical; or (b) hiring or engaging any current Performance Chemical employee as an employee or independent contractor;

3.    A temporary restraining order for the maximum time period allowed by law, temporary injunction through trial, and permanent injunction, prohibiting True Chemical (and its officers, agents, or employees), Pitcock, Gabriel, Hinrichs, Schmidt, Perry, Kalt, and Phillips from using or disclosing (except by Court order or Plaintiffs' request) Performance Chemical's Trade Secrets and Confidential Information. "Confidential Information" means: information regarding Performance Chemical's methodology; pricing information; plans regarding employees, customers, management, and operations; short- and

19

long-term goals; strategies; operations;  prospective customers; and bids for customers and prospective customers;

4.    A temporary restraining order for the maximum time period allowed by law, temporary injunction through trial, and permanent injunction, prohibiting True Chemical (and its officers, agents, or employees), Pitcock, Gabriel, Hinrichs, Schmidt, Perry, Kalt, and Phillips from destroying, removing, or secreting documents or records that are:

    i.    Communications sent to or from an e-mail account provided by Plaintiff  or Defendant True Chemical;

    ii.    Communications mentioning or referring to Plaintiff;

    iii.    Communications between any of the Defendants;

    iv.    Communications between Defendants and Plaintiff's current employees;

    v.    Records obtained from Plaintiff;

    vi.    Records of payments from any Defendant to any former employee of Plaintiff;

    vii.    Communications sent to or from customers;

    viii.    Documents sent to or from customers;  and

    ix.    Bids and proposals by True Chemical to customers.

5.    All actual damages suffered by Performance Chemical, an amount which is in excess of the  minimum jurisdictional limit of the Court;

6.    Punitive damages;

7.    Attorneys' fees;

8.    Costs of suit, pre judgment and post judgment interest in the maximum amounts  allowed by law; and

9.    Any and all other relief to which Performance Chemical may be entitled in law or equity.

Respectfully submitted,

LYNCH, CHAPPELL & ALSUP, P.C.
300 North Marienfeld, Suite 700
Midland, Texas 79701
(432) 683-3351
Fax (432) 683-2587


BY: _____ /s/ Randall L. Rouse_____
Randall L. Rouse
rrouse@lcalawfirm.com
State Bar No. 17324300
Lisa K. Hooper
lhooper@lcalawfirm.com
State Bar No. 24047282

ATTORNEYS FOR PLAINTIFF
PERFORMANCE CHEMICAL
COMPANY

## VERIFICATION

**STATE OF TEXAS**                                    §
                                                      §
**COUNTY OF MIDLAND**                                 §


BEFORE ME, the undersigned authority, on this day personally appeared Burl Fuller, *President* of Performance Chemical Company, Plaintiff in this case, and after being by me duly sworn, deposes and says that the matters stated therein are true and correct and that he has personal knowledge of each of those matters.

SIGNED this the 3rd day of May, 2017.

_____
BURL FULLER
President of Performance Chemical
Company


SWORN TO AND SUBSCRIBED BEFORE me by the said Burl Fuller on this the 3rd day of May, 2017.

Debbie J. Staggs
Notary Public, State of Texas
Notary ID 5326220
My Commission Exp. 03-02-2021

_____
NOTARY PUBLIC
in and for State of Texas