IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| PERFORMANCE CHEMICAL COMPANY | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| | § | Civil No. 6:21-CV-00222-ADA |
| *v.* | § | |
| | § | |
| TRUE CHEMICAL SOLUTIONS, LLC | § | |
| | § | |
| *Defendant* | § | |

**PERFORMANCE CHEMICAL COMPANY'S MOTION FOR SANCTIONS
BASED ON DISCOVERY ABUSE AND SPOLIATION OF EVIDENCE**

Plaintiff Performance Chemical Company ("PCC") files this motion for sanctions against Defendant True Chemical Solutions, LLC ("True Chem") based on True Chem's discovery abuse and spoliation of evidence. PCC is mindful of the Court's expectation that sanctions motions should be reserved for the most egregious situations.  Unfortunately, this is such a case—and PCC has no choice but to file this motion in order to redress the prejudice it has suffered due to True Chem's misconduct.

**INTRODUCTION**

Throughout this litigation, True Chem has maintained, under oath and in filings with this Court, that it never automated its frac trailers. Despite multiple explicit requests from PCC for evidence of its automation and a direct order from this Court that it produce the frac trailers for inspection with all such equipment, True Chem never produced any automation equipment for inspection. It never disclosed the identity of any individuals with knowledge of its efforts automating its trailers. It withheld key documents directly proving that True Chem had automated

the trailers. And, in fact, True Chem's defense of this case has been based on a claim that it did not automate the trailers and therefore did not infringe the patents.

On March 15, 2021, less than two weeks before trial in this case, PCC received never-before-seen documents from third-party B&H Industrial Electrical Construction and Maintenance, Inc. ("B&H"), establishing beyond any doubt that True Chem had installed, tested, and used a programmable logic controller ("PLC"), Human Machine Interface ("HMI"), and cellular modem to automate and remotely monitor and control at least one of its frac trailers. PCC then deposed Ben Walter, the software engineer who had assisted B&H with the development of the automation technology. Mr. Walter confirmed that his directive was to program the PLC and HMI devices in order to automate and remotely monitor and control True Chem's trailers.

On March 18, 2021, a little more than a week before trial and one day after the production by B&H, True Chem claimed to have suddenly found the PLC/HMI component installed by B&H and offered to deliver it to PCC. This component was removed from True Chem's frac trailer and therefore not present during PCC's court-ordered inspection of True Chem's frac trailers a year earlier. True Chem's removal and concealment of the component violated both its duty to preserve evidence and this Court's order, which required True Chem to present all components of True Chem's frac trailers for inspection, regardless of whether the components were presently installed.

True Chem's dismantling of its frac trailer(s) to remove evidence of automation, its concealment of the PLC/HMI component until discovery from a third party left it no choice but to reveal its existence on the eve of trial, and its misrepresentations to PCC and the Court regarding its automation activity, have deprived PCC of valuable evidence needed to develop its case of infringement by use. True Chem's discovery abuse has also caused PCC to incur thousands of dollars in unnecessary attorneys' fees attempting to secure discovery that should have been

4821-6276-3489

produced years ago, and otherwise working up its case based on assumptions regarding available evidence that were, in fact, untrue. Accordingly, PCC moves the Court to impose sanctions to remedy the prejudice True Chem has caused PCC and to deter future such misconduct by True Chem.

## FACTUAL BACKGROUND

The core of PCC's claims against True Chem involve True Chem's infringement of PCC's patented Automated Water Treatment Trailers ("frac trailers"). PCC alleges that True Chem infringed its patents in two ways: (1) by manufacturing frac trailers reasonably capable of satisfying the limitations of the patents at issue; and (2) infringing by use.

A key disputed issue in the case has been whether True Chem automated its frac trailers by using a PLC to automate, monitor, and allow for remote control of the pumps within the trailer—in other words, whether True Chem has used its trailers in a way that infringes PCC's patents. For that reason, PCC has repeatedly asked True Chem to produce any evidence of its automation activities, including the installation or use of a PLC to allow for remote operation and control of the frac trailers. True Chem has repeatedly denied having installed a PLC or otherwise automated its trailers.

### A.     The Court expressly orders True Chem to present its frac trailer for inspection along with any components that would be installed in the trailer when in use.

From the outset of discovery, PCC has asked to inspect True Chem's frac trailers and all equipment used in those trailers.[1] True Chem resisted inspection and, on January 15, 2020, this Court ordered True Chem to present its trailers for inspection.[2] PCC was concerned that, because

---

[1] **Ex. A**, Scardino Declaration ¶¶ 2-3.
[2] **Ex. B**, 1/15/20 Hearing Transcript at 14:9-15:3.

the inspection was to take place at True Chem's storage facility rather than in the oilfield, True Chem may present incomplete trailers during the inspection that lacked certain components that had been used in the oilfield. Specifically, PCC was concerned that any PLCs used to automate the trailers would not be present as they may not be installed until after the trailers were employed in the field. To address PCC's concerns, the Court explicitly ordered True Chem to present its frac trailers and all components True Chem would install on the trailer when in use for inspection:

> THE COURT: Well, what I -- what -- Mr. John, what I want you to make available to Mr. Scardino and his expert tomorrow are ***all of the components of the equipment that you install that are owned or controlled by True Chemical Solutions. Whether they are attached or not***, I'm assuming Mr. Scardino's expert is sophisticated enough that if he sees the apparatus and he is also given access to see a computer that is in y'all's custody and control, I would assume as an expert he would be able to make the connection of how they get connected sufficiently that he could opine at trial or in his expert report with respect to how that element -- as to whether that necessary element in the claim is there or not, ***but anything that is in the custody or control of True Chemical Solutions that's a part of the equipment that True Chemical Solutions installs at the customer facility I want you to make available to Mr. Scardino and his expert tomorrow. Does that make sense***?

> MR. JOHN: Yes, Your Honor. We will do that. ***Anything that's in our custody and control and in our possession there and that would be connected for operation on the trailer we will of course make that available***.[3]

When PCC inspected True Chem's frac trailers, no PLC automation device was present in any of the trailers, either attached or detached.[4] The trailers were manufactured so as to be capable of automation and remote monitoring and control—they had the components that would interact with a PLC to automate the trailer.  But no automation equipment directly reflecting an infringing use was present in the trailers.[5] True Chem's T-9 trailer, however, was visibly wired to allow

---

[3] *Id.* (emphasis added).
[4] **Ex. A** at ¶ 4.
[5] *Id.*

remote control of pumps via a PLC—with the PLC device notably absent.[6] Accordingly, PCC was forced to prove up its infringement theories based only on circumstantial evidence of infringing use.[7]

### B. True Chem repeatedly testifies under oath and represents to the Court that it did not attempt to automate the trailers by installing a PLC.

After the January 2020 inspection, PCC engaged in exhaustive efforts to discover evidence from True Chem regarding its automation of the frac trailers. In response, True Chem repeatedly denied, under oath and in representations to this Court, that it ever used or installed automation and remote monitoring capabilities.

For example, in a March 3, 2020 deposition, PCC asked True Chem's frac division manager and Vice President of Operations, Tyler Hinrichs, whether True Chem had any connections in its trailers that could be used with a PLC. Mr. Hinrichs responded: "[w]e don't mess with that."[8] He also testified, "I don't have any flow meters and I don't use any software[,]"[9] "I don't have an automated trailer,"[10] and that he had never tried to automate True Chem's trailers because, in his opinion, "if you take the [human] out of it . . . you're asking for disaster."[11] Mr. Hinrichs also explicitly testified that True Chem did not use Port 4 on its Graco controller (the port for connection to a PLC) and did not configure the Graco controller for external control.[12]

---

[6] *Id.*
[7] *Id.* at ¶ 5.
[8] **Ex. C**, 3/3/20 Hinrichs Depo., at 260:14-17.
[9] *Id.* at 237:8-10.
[10] *Id.* at 71:5-6.
[11] *Id.* at 227:25-228:25.
[12] *Id.* at 131:13-24; 260:14-17.

True Chem's interrogatory responses again swore that the company did not use the automation or remote monitoring capabilities in its frac trailers. For example, PCC's Interrogatory No. 15 specifically asked True Chem to identify any PLC's installed in the frac trailers:

> INTERROGATORY NO. 15: Identify each water treatment trailer designed, constructed, built, or manufactured by or for True Chemical since January 1, 2017, and describe in detail the structure, function and operation of each identified water treatment trailer including functionality relating to data communications among pumps (including pump controllers), Control Devices, and Client Devices.[13]

In response,[14] True Chem did not identify the PLC component B&H installed, and instead stated:

> 1) True Chem is unaware of any electronic communication between one pump and another pump;
>
> 2) True Chem is unaware of any electronic communications between a pump and a control device (other than a pump controller);

True Chem also attested that it was unaware of any connections to external client devices:[15]

> 5) Other than as set forth in paragraph 4 above, True Chem is unaware of any other electronic communications between a pump controller and a client device in a True Chem frac trailer; and
>
> 6) Other than as set forth in paragraphs 4 above, True Chem is unaware of any electronic communications between a control device and a client device in a True Chem frac trailer.

---

[13] **Ex. A-1**, PCC's Second Set of Interrogatories, No. 15. The definition of Control Devices included electrical devices and components that could be combined with a programmable logic controller ("PLC"). *Id.*, Definition No. 19.

[14] Exs. **A-2** (True Chem's Responses to PCC's Second Set of Interrogatories)**, A-3** (True Chem's Verification of Responses to PCC's Second Set of Interrogatories) (Although True Chem only verified its original responses to PCC's second set of interrogatories, True Chem's two supplemental responses did not substantively change the verified response cited above).

[15] *Id.* Note that paragraph 4 related to ProMinent pump controllers which are not relevant to this case or this Motion.

4821-6276-3489

In its response to PCC's Interrogatory 22, True Chem swore as follows:

> True Chem does not utilize cellular, WiFi, Ethernet, serial communication protocols, such as RS-232 and USB, IoT, or SCADA interfaces, in True Chem's frac trailers to communicate with a pump controller. True Chem employees do utilize cellular phones, which are capable of being connected to laptop computers via WiFi or USB.

Based on the circumstantial evidence of infringing use, but hitting a wall with True Chem's denials, PCC sought an additional order compelling inspection of the laptops and other devices that True Chem had used in connection with remotely monitoring and controlling the Graco pumps contained in its frac trailers.[16] True Chem resisted this discovery, representing to the Court in its response, multiple times, that no such automation had ever been done and all relevant devices had been presented during the January inspection:

> True Chem's frac trailers (including especially its pumps and pump controllers) are not and have never been connected to its laptops, cellphones or the server hosting True Chem Live (Hinrichs 226:5- 227:7, Exhibit 1).[17]
>
> . . . PCC insists on a forensic examination of all company laptops, computers, servers, and smartphones without regard to their use in an accused frac trailer or any connection to the claims of the Patents-in-Suit. PCC's demand is unreasonable, outside the scope of its Request for Inspection, and onerous at best. PCC's definition of Control Device is limited to devices that are capable of "receiving feedback relating to fluid characteristics, flow rates, pressure, pump cycles, fluid flows, specific gravity and pressure in a water pipe of materials, from mechanical devices, such as motors, pumps, gauges, and valves;" or "providing control signals or commands that modify the operation of such mechanical devices." ***None of True Chem's laptops, computers, servers, or smartphones have those capabilities. The only devices having at least some of the identified capabilities were presented in True Chem's frac trailers during PCC's inspection in January***.[18]
>
> The only devices that include these capabilities are the pump controllers that were present in True Chem's frac trailers during PCC's inspection in January, as

---

[16] PCC 6/16/2020 Motion to Compel, ECF No. 124.

[17] True Chem Response to PCC Motion to Compel, ECF No. 140, at 2.

[18] *Id.* at 9 (emphasis added).

specifically requested by PCC. ***<u>True Chem has already produced all devices that are responsive to this new request</u>***.[19]

***<u>True Chem has provided full and complete inspections of its frac trailers</u>***, which PCC relies upon with respect to its infringement contentions.[20]

True Chem made this same representation to Judge Manske at the discovery hearing, which led to Judge Manske denying PCC's Motion:

> MR. SCARDINO: Again, the response is being limited to a pump controller. What about a controller which is a separate element of the claims, or a PLC device, or something that the Court described in its claim construction order like a -- any other number of pieces of electronic equipment that could utilize these communication technologies. Are they representing that they've never, you know, hooked up any of those devices and never used any of these communication protocols that communicate with any of those devices?
>                     ***
> MR. MORGAN: Your Honor, the claims require there to be communication between the user device (indiscernible) ***<u>and we don't have it. We just don't</u>***. Counsel knows that. We've had testimony from Mr. Poole with respect to True Chem Live, and we have testimony with respect to our 30(b)(6) saying there's no connection in the phones or in the laptops . . .[21]

To be clear, PCC is not accusing True Chem's counsel of deliberately misleading the Court or engaging in spoliation. PCC's assumption is that counsel was relying on what its client (falsely) told them about its automation activities and equipment. In any event, based on True Chem's representations, Judge Manske ultimately declined to order an additional inspection of True Chem's devices, and instead ordered True Chem to perform an ESI search, ***<u>largely at PCC's expense</u>***.[22]

On November 18, 2020, based on Judge Manske's orders, True Chem and PCC agreed that, within two weeks and two days, True Chem would produce documents received from the ESI

---

[19] *Id.* at 10 (emphasis added).
[20] *Id.* at 11-12 (emphasis added).
[21] **Ex. D**, Transcript of 8/31/20 Discovery Hearing, at 40:7-41:4 (emphasis added).
[22] **Ex. D** at 44:22-45:21; **Ex. A** at ¶ 9.

4821-6276-3489

search to PCC.[23] True Chem ultimately began to produce these documents four weeks later, on December 18, 2020, and continued that production into January 2021.[24] Prior to the ESI search, True Chem had produced only about 5,201 pages of documents total.[25] The ESI search resulted in a document production of approximately 50,771 new documents in discovery, approximately ten times the amount of documents produced during the entirety of the case to date.  All of these documents were produced after the close of discovery, after the expert report deadline, and after the deadline for the parties' pretrial order filings.[26]

PCC's review of these new documents led to the recent discovery of new third party witnesses who appeared to have been retained by True Chem to automate its frac trailers.[27] These third parties include Frances and Joshua Bittler of B&H and Ben Walter of Integ Automation, LLC.[28] True Chem had never before disclosed the identity of these witnesses in the litigation.[29]

### C. Less than two weeks before trial, third party B&H produces never-before-seen documents establishing that True Chem had installed and used a PLC/HMI in its frac trailers.

PCC issued a subpoena to B&H for its records regarding the automation work it performed for True Chem. The documents produced by B&H on March 17, 2021 confirm that True Chem hired B&H to install a PLC/HMI component to automate True Chem's frac trailers in the Spring and Summer of 2019.[30]

---

[23] **Ex. A-4**, 11/18/20 email agreement.
[24] **Ex. A** at ¶ 11.
[25] *Id.* at ¶ 12.
[26] *Id.*
[27] *Id.* at ¶ 13.
[28] *Id.*
[29] *Id.*
[30] *Id.* at ¶ 14; *see also* **Ex. E**, B&H business records, at BandH000001-32.

9

One of these documents was an invoice that B&H sent True Chem on December 10, 2019,[31] approximately one month before the discovery hearing in which the Court ordered True Chem to make its trailers available for inspection along with "anything that is in the custody or control of True Chemical Solutions that's a part of the equipment that True Chemical Solutions installs . . ."[32] This invoice was directed to Tyler Hinrichs, and it described the project as "work performed and work completed for *True Chemical Solutions Automation Trailer*."[33] Emails produced by B&H[34] also demonstrate that the PLC/HMI device installed in the automated trailer was actually tested and used in the field in the Summer of 2019:

**From:** Matt Kennedy [mailto:matt@bandhelectrical.com]
**Sent:** Tuesday, August 6, 2019 7:59 AM
**To:** Aaron Shine <ashine@bdpayne.com>; bill bittler <bill@bandhelectrical.com>
**Cc:** Frances Bittler <fran@bandhelectrical.com>; Nestor Arria <narria@bdpayne.com>
**Subject:** Re: True Chemical trailer

Good Morning,

So currently the trailer is ran in Manual mode,  the pumps will not run manually without seeing an actual 4-20 from the main flow meter. The customer is having to physically take control of the pumps at the individual drives to run them without utilizing the main flow meter. We need to be able to utilize the auto mode for running off the main flow meter. We need to be able to put one or all pumps in manual mode and run from the HMI without having to utilize the main flow meter.

Thanks
Matt

In short, approximately two weeks before trial, significant direct evidence of True Chem's infringement-by-use became available to PCC for the very first time in this case.

---

[31] **Ex. E** at BandH000001.
[32] **Ex. B**, 1/15/20 Transcript, at 14:9-15:3.
[33] **Ex. E**, B&H Business Records Affid., at BandH000001.
[34] *Id.* at  BandH000012.

**D.    PCC Deposes Benjamin Walter, who confirms what the B&H invoices revealed—B&H installed a PLC and HMI on True Chem's frac trailers in the Spring of 2019.**

On March 19, 2021, PCC deposed Benjamin Walter. Mr. Walter was a subcontractor hired by B&H who assisted with programming the PLC/HMI that B&H installed on one of True Chem's frac trailers.[35] Mr. Walter explained that True Chem "wanted to create these chemical injection trailers that would be—you could basically park it by a site and make it do what it does . . . so that you could remotely control the trailers."[36] His understanding was that, after automation of the first trailer, True Chem would automate the remaining trailers.[37] Mr. Walter confirmed that, when he visited the site in March or April of 2019, B&H had mounted a PLC within the trailer.[38] He further confirmed that the PLC and HMI were still mounted the last time he was in the trailer as of May 2019.[39] The devices were in a cabinet that was mounted onto the wall with screws and bolts.[40] He testified that he understood the PLC/HMI installation to be a "permanently mounted fixture into this trailer" and that he was surprised to see that it had been removed in the picture he reviewed from the date of PCC's inspection in January 2020.[41]

---

[35] **Ex. F**, Walter Dep. at 7:3-17; 7:24-9:13; 19:17-21:16.
[36] *Id.* at 30:1-11.
[37] *Id.* at 30:1-18.
[38] *Id.* at 13:16-14:2; 14:12-14; 14:17-19; 61:9-63:17.
[39] *Id.* at 63:19-67:1.
[40] *Id.* at 69:15-70:10
[41] *Id.*

4821-6276-3489

**E.  After B&H produces the invoices affirming that it installed a PLC/HMI in True Chem's frac trailer, True Chem produces the PLC/HMI component it had routinely sworn did not exist—and that had been removed from its frac trailer in advance of PCC's inspection.**

Shortly after True Chem received copies of the B&H documents confirming installation of the PLC/HMI device on its frac trailer, counsel for True Chem emailed counsel for PCC stating that True Chem had in its possession the PLC/HMI component that B&H installed:

> We have the PLC/HMI that we believe corresponds to the B&H project and that is referenced in Dr. Beaman's supplement report.  To the extent you would like it, we can box it up and deliver it to you.  If so, please let us know if you'd prefer it sent to you in Austin or to PCC's facility in Midland.[42]

True Chem provided no explanation as to where the component had been all this time, why and when the component was removed from the frac trailer, how True Chem suddenly found the component once B&H produced the invoice for its installation, or why True Chem's representatives repeated under oath that they had never automated True Chem's frac trailers.

On March 20, 2021, the PLC/HMI equipment was received by PCC's counsel.[43]  As reflected by the attached photographs,[44] this is a large piece of equipment.

---

[42] **Ex. A-5**, March 18, 2021 email from counsel for True Chem to counsel for PCC.
[43] **Ex. G**, Amstutz Decl. ¶ 2.
[44] **Ex. G-1**.

12



Not only would unbolting and removing a piece of equipment this size from a trailer require considerable effort, this is not a small device that is easily lost.

Although PCC's expert, Dr. Beaman, will inspect the PLC equipment before he testifies at trial next week, it is too late to perform detailed testing on the device, to retain a software/electrical engineer expert to study the device, or to conduct further discovery from True Chem or its other vendors regarding the extent of its use of this device—or other similar devices that may still be hidden. In short, the only reason that PCC has recovered this evidence is because True Chem has been caught. Had True Chem complied with its discovery obligations in this case, PCC would have had the opportunity to perform additional discovery and to work up its infringement case based on that evidence. Instead, it is facing the untenable choice of further delaying a trial setting that has already been delayed six times, or proceeding to trial without a full presentation of all available evidence.  This is precisely the type of situation that discovery sanctions are designed to address.

## ARGUMENT

The Court should sanction True Chem for spoliating evidence, abusing the discovery process, and violating Court orders. It is clear that True Chem concealed its automation of its frac

13

trailers for over a year. During the course of this lawsuit, True Chem dismantled at least one of its frac trailers, removed and hid a key piece of evidence—the PLC/HMI device—and then denied under oath that any such device existed.

Further, True Chem violated this Court's order to present all components of True Chem's frac trailers for inspection when it failed to produce the PLC/HMI for inspection in January 2020. It is no coincidence that True Chem "found" the missing PLC/HMI component almost immediately after B&H disclosed its existence. And given that True Chem never disclosed B&H, Ben Walter, or any other contractors, it is reasonable to conclude that this evidence would have remained hidden had PCC not issued a subpoena to B&H and questioned Ben Walter. The Court cannot let True Chem's discovery abuse go unpunished.

### A.    Standard

This Court may sanction True Chem for its discovery abuse and spoliation under its inherent authority and under the authority of Federal Rule of Civil Procedure 37.  *See* Fed. R. Civ. P. 37; *Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336, 1342-43 (Fed. Cir. 2013); *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 615–16 (S.D. Tex. 2010) (Rosenthal, J.). PCC asks the Court to enter sanctions proportionate to the egregious misconduct at issue, including adverse inference instructions, a restriction on True Chem's ability to use the withheld evidence at trial, and an award of PCC's attorneys' fees.

A party seeking an adverse inference instruction based on spoliation of evidence must establish that: (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Rimkus*, 688 F. Supp. 2d at 615–16

(citing *Zubulake v. UBS Warburg LLC* (*Zubulake IV*), 220 F.R.D. 212, 220 (S.D.N.Y. 2003)). The "relevance" and "prejudice" factors of the adverse inference analysis can be broken down into three subparts: "(1) whether the evidence is relevant to the lawsuit; (2) whether the evidence would have supported the inference sought; and (3) whether the nondestroying party has suffered prejudice from the destruction of the evidence." *Id.* (citing *Consol. Aluminum Corp. v. Alcoa, Inc.,* 244 F.R.D. 335, 346 (M.D. La. 2006)).

Additionally, under Rule 37, the Court has discretion to sanction a party who violates discovery orders. *Alexsam*, 715 F.3d at 1342. Sanctions available include:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
>
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
>
> (iii) striking pleadings in whole or in part;
>
> (iv) staying further proceedings until the order is obeyed;
>
> (v) dismissing the action or proceeding in whole or in part;
>
> (vi) rendering a default judgment against the disobedient party; or
>
> (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(a).

> **B.    The Court may grant sanctions when a defendant engages in a scheme to conceal or alter incriminating evidence.**

Judge Rosenthal's opinion in *Rimkus* provides clear guidance as to why sanctions are appropriate here. In *Rimkus*, the Cammarata Defendants deleted incriminating emails, donated or threw away laptop computers from which the deleted emails might have been recovered, and lied about their personal email accounts. *Id.* at 641-42. Rimkus learned about the coverup scheme

through a deposition in which a witness revealed the Camarrata Defendants' agreement to delete all emails more than two weeks old. *Id.* at 642. But this deletion policy was selectively implemented, as the defendants maintained certain emails but selectively chose to delete others after the lawsuit was filed. *Id.* Rimkus also received documents that the Camarrata Defendants withheld throughout the discovery period revealing the scheme to delete emails. *Id.* Rimkus was able to recover some deleted emails, which showed that the deletions were of emails related to the Cammarata Defendants' use of Rimkus' confidential information to form a competing business and solicit Rimkus' clients. *Id.*[45]

As a sanction, Rimkus sought to strike the Cammarata Defendants' pleadings and enter a default judgment, or in the alternative, give an adverse inference jury instruction at trial. *Id.* at 640. Rimkus additionally sought reimbursement of costs and fees incurred in discovery or attempting to discover the spoliated evidence in a motion for sanctions. *Id.* The Cammarata Defendants argued that such sanctions were unwarranted because Rimkus had obtained sufficient evidence to argue its case without the deleted emails. *Id.* The court disagreed.

First, the court held that the Cammarata Defendants violated their duty to preserve by deleting relevant emails during the pendency of litigation and by giving away or destroying laptops containing such emails. *Id.* at 642. Second, the court held that their deletion of evidence was intentional and done in bad faith because their proffered explanation for the deletion was

---

[45] It is revealing that True Chem engaged in similar misconduct in the related state-court litigation with PCC over its theft of trade secrets. Forensic analysis revealed that True Chem's employees, while still employed at PCC, had downloaded information onto thumb drives. True Chem never produced the thumb drives in discovery, despite a court order to do so, and, in the face of spoliation findings, settled the case. PCC sought to recover the thumb drives in this case, ECF No. 124 at 10-11 (PCC Motion to Compel), and True Chem again maintained that it had searched the devices but had been "unable to locate" four of the devices. ECF No. 138 at 10-11 (Response). The thumb drives have still never been produced.

inconsistent and lacked record support. *Id.* The court focused on the Cammarata Defendants' failure to disclose their use of personal email accounts to obtain and disseminate emails from Rimkus, and that some of the recovered emails revealed that their previous denial that they took information from Rimkus was false and that they had used at least some of it in competing with Rimkus. *Id.*at 644.

Third, the court held that even though Rimkus had access to other extensive evidence to support its claim, a sanction lesser than a death penalty sanction was still "warranted to level the evidentiary playing field and sanction the improper conduct" because the contents of the lost records showed that some of the deleted evidence would have been favorable to Rimkus. *Id.* at 645. While the court declined to enter a default judgment or strike the Cammarata Defendants' pleadings, the court found it appropriate to issue an adverse inference instruction to the jury:

> The jury will receive an instruction that in and after November 2006, the defendants had a duty to preserve emails and other information they knew to be relevant to anticipated and pending litigation. If the jury finds that the defendants deleted emails to prevent their use in litigation with Rimkus, the jury will be instructed that it may, but is not required to, infer that the content of the deleted lost emails would have been unfavorable to the defendants. In making this determination, the jury is to consider the evidence about the conduct of the defendants in deleting emails after the duty to preserve had arisen and the evidence about the content of the deleted emails that cannot be recovered.

*Id.* at 646–47.

Additionally, the court ordered the Cammarata Defendants to pay the reasonable costs and attorneys' fees required to identify and respond to the spoliation because Rimkus

> spent considerable time and money attempting to determine the existence and extent of the spoliation, hampered by the defendants' inconsistent and untruthful answers to questions about internet accounts and retention and destruction practices. The defendants failed to produce documents in compliance with court orders. Rimkus also expended significant time and effort to obtain some of the deleted emails and attachments.

*Id.* at 647. This included the cost of third party subpoenas to obtain the information that helped

lead Rimkus to discover their malfeasance. *Id.* The court held that these sanctions were

appropriate, under the Court's inherent authority and Federal Rule of Civil Procedure 37, to punish

and deter defendants' discovery abuse and remedy the prejudice to the Rimkus. *See id.* 640-647.

True Chem's conduct in this case warrants a similar sanction.

> **C.    The Court should sanction True Chem to deter its bad faith concealment of incriminating evidence and violation of court orders and to remedy the prejudice to PCC.**

True Chem violated its duty to preserve evidence by removing and hiding the PLC/HMI

component from its frac trailer prior to PCC's site inspection.[46] Moreover, True Chem violated its

discovery obligations by failing to disclose B&H, Ben Walter, or any of the other contractors used

to automate its trailers and install the device(s). True Chem then withheld key invoices from B&H

related to the PLC/HMI installation even though the invoices were undoubtedly relevant to this

case and responsive to PCC's discovery requests. During depositions and in sworn interrogatory

responses, True Chem representatives repeatedly stated under oath that they did not try to automate

their trailers or install a PLC/HMI, representations that were false. And, in resisting discovery,

True Chem represented to the Court that there were no automation devices.

Only when B&H responded to PCC's subpoena with documents confirming the existence

of the PLC/HMI and revealing the extent of True Chem's misrepresentations did True Chem

suddenly find the PLC/HMI component that had been concealed for over a year. Had PCC not

---

[46] This lawsuit was filed on April 27, 2018. ECF No. 1. PCC first alleged infringement claims against True Chem on May 18, 2018. ECF No. 9. B&H's documents and Mr. Walter's testimony reflect that the PLC/HMI were installed by March or April 2019. **Ex. E, Ex. F** at 13:16-14:2; 14:12-14; 14:17-19; 61:9-63:17. The final invoice for this work was sent in December 2019. **Ex. E** at BandH000001. The PLC/HMI device was no longer in the trailers by the January 2020 inspection. **Ex. A** at ¶ 4.

issued a subpoena to B&H, it is likely True Chem would have never produced the PLC/HMI it removed from the trailer.

True Chem's concealment also violated this Court's clear order to present all components used with the frac trailer regardless of whether the component was presently installed. Even if True Chem removed the PLC/HMI prior to the Court's order, it was nonetheless required to present it for inspection.

True Chem's actions, in violation its duty to preserve evidence and in violation of this Court's order, clearly prejudiced PCC. This missing evidence was critical to the development of PCC's case. By concealing the PLC/HMI, True Chem denied PCC the ability to fully investigate and develop its case of infringement by use. Had True Chem presented the PLC/HMI at the inspection instead of on the eve of trial, PCC's allegations in its complaint and its expert reports would have been prepared differently, relying on direct instead of circumstantial evidence of patent infringement by use. Moreover, PCC would have had time prior to trial to investigate and discover what other incriminating evidence True Chem had altered or concealed—including whether True Chem installed and used PLC/HMI devices in all its trailers.

Instead, PCC has had to waste hours of attorney and expert time developing its infringement-by-use case based primarily on circumstantial evidence.[47] Additionally, many hours were wasted on motions to compel, discovery hearings, depositions, the ESI search of which PCC had to pay 2/3 of the cost, the review of ESI documents, and the pursuit of third-party subpoenas and depositions.[48] All this expense could have been avoided if True Chem had not wrongfully concealed key evidence and made misrepresentations to PCC and the Court.

---

[47] **Ex. A**, Scardino Decl. ¶¶ 5-6, 9, 17.
[48] *Id.*

PCC does not have the luxury of engaging in a lengthy trial delay in order to pursue additional discovery, secure new expert opinions, and otherwise fully pursue this new evidence. As this Court has recognized, the trial setting in this case has already been delayed multiple times, and the longer trial is delayed the more prejudice PCC will suffer due to a delay of its right to secure injunctive relief from True Chem.  ECF No. 278 (Order on Venue) at 12-13.

In sum, True Chem's conduct, including its attempts to conceal valuable evidence, misrepresentations in discovery responses, and false testimony, constitutes clear evidence of an intentional, bad faith violation of its duty to preserve evidence. Accordingly, sanctions are justified and necessary to deter True Chem from committing these actions once again, and to remedy the prejudice True Chem has inflicted on PCC. *See Rimkus,* 688 F. Supp. 2d at 640–47; *see also Alexsam, Inc.*, 715 F. 3d at (); *Chilcutt v. United States*, 4 F.3d 1313, 1319, 1327 (5th Cir. 1993) (affirming discovery sanctions under Rule 37 where the Government had disadvantaged the plaintiffs by producing the documents on the eve of trial).

PCC therefore moves the Court to impose the following sanctions:

- The Jury be given an instruction that the "controller" elements of Claim 1 of the 452 Patent and Claim 1 of the 501 Patent are met with respect to the question of True Chem's infringement;[49]

- The jury be given an adverse inference instruction that True Chem had a duty to preserve evidence it knew to be relevant to anticipated and pending litigation. If the jury finds that True Chem altered or concealed evidence to prevent its use in litigation with PCC, the jury should be instructed that it may, but is not required to, infer that the content of the altered or concealed evidence would have been unfavorable to the True Chem. In making this determination, the jury is to consider the evidence about the conduct of True Chem in altering and concealing evidence

---

[49] *See, e.g.*, *Alexsam*, 715 F.3d at 1345 (upholding sanction deeming infringement based on the defendant's failure to disclose key evidence of infringement in discovery responses, violation of court orders, and delay until the last day of the discovery period to produce evidence).

4821-6276-3489

after the duty to preserve had arisen and the evidence about the content of the altered or concealed evidence that cannot be recovered;[50]

- The jury be given an instruction that, if it finds that True Chem automated one of its trailers via use of a PLC/HMI device, it may infer that True Chem has automated all of its trailers using that same type of device;[51]

- The jury be given an instruction that, if it finds that True Chem infringed on PCC's patents, it must also find that True Chem's infringement was willful based on True Chem's spoliation and concealment of evidence or, alternatively, that it may consider True Chem's spoliation and concealment of evidence in deciding whether True Chem's infringement was willful;[52]

- PCC is expressly permitted to present all evidence of True Chem's litigation misconduct to the jury, including but not limited to its representations to the Court, its employees' false testimony, its dismantling of the trailers to conceal evidence of the PLC/HMI devices, its concealment of key witnesses and documents, and its belated production of the concealed PLC/HMI device on the eve of trial.[53]

- True Chem be prevented from using or referencing, in any way, the evidence recently uncovered from B&H, Ben Walter, Joshua Bittler, or the PLC/HMI device

---

[50] *See, e.g.*, *Rimkus*, 688 F. Supp. 2d at 646-47; *see also Sanofi-Aventis Deutschland GmbH v. Glenmark Pharm. Inc., USA*, 748 F.3d 1354, 1362-63 (Fed. Cir. 2014) (affirming adverse inference instruction in patent infringement case when defendant failed to take steps to retain relevant documents during critical time period despite being on notice to preserve documents); *Carter v. Burlington N. Santa, LLC*, No. 4:15-CV-366-O, 2016 WL 3388707, at *5 (N.D. Tex. Feb. 8, 2016) (adverse inference sanction imposed along with payment of attorneys' fees under Rule 37 and court's inherent authority for destroying documents prior to deposition, violating court order to produce all documents, and misrepresenting to the court that destroyed documents were not relevant); *Marines UPS Ground Freight, Inc. v. Transp. Services, Inc.*, No. DR-07-CV-072-AML/CW, 2011 WL 13175785, at *7 (W.D. Tex. Mar. 31, 2011) (granting adverse inference sanction when Defendant failed to preserve requested documents and did not take steps to insure that such requested documents were not destroyed).

[51] *See Rimkus*, 688 F. Supp. 2d at 646-47; *Sanofi-Aventis Deutschland GmbH*, 748 F.3d at 1363.

[52] Fed. R. Civ. P. 37(b)(2)(A)(i); *see Alexsam*, 715 F.3d at 1344-45; *Compaq Computer Corp. v. Ergonome, Inc.*, 387 F.3d 403, 412 (5th Cir. 2004) (holding that a corporation may be deemed an alter ego of other corporation as a Rule 37 sanction for failure to obey court order on discovery related to alter ego status).

[53] PCC seeks this particular order only as a matter of clarity—such evidence is otherwise admissible and relevant in this willful infringement case, even without a sanction. *See Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1225 (Fed. Cir. 2006); *Read v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992) (infringer's conduct during litigation relevant to willfulness).

4821-6276-3489

except in direct response to questions from PCC's counsel.  This includes, but is not limited to (1) reference to evidence of PLC/HMI installation to argue that such installation was limited to only one trailer and therefore limits PCC's infringement or damages theories; and (2) attempts to argue that PCC has "opened the door" by presenting evidence or argument regarding the new evidence.[54]

- True Chem be required to pay PCC's reasonable costs and attorney's fears incurred as a result of True Chem's spoliation and other discovery abuse, in an amount to be established after entry of the sanctions order.[55]

### D.     The sanctions sought by PCC are fair and proportionate.

Under Fifth Circuit law, less severe sanctions like those PCC seeks here are appropriate when those sanctions are just and fair under the circumstances, have a substantial relationship to the facts sought to be established by the discovery, and meet Rule 37's goals of punishment and deterrence.  *See Alexsam*, 715 F.3d at 1342-43 (applying Fifth Circuit law); *Chilcutt*, 4 F.3d at 1320.  These factors are easily met in this case.

In *Alexsam*, the defendant withheld documents of critical importance to the plaintiff's infringement claims and then failed to disclose the information in interrogatory responses. *Alexsam*, 715 F.3d at 1343.  The court granted the plaintiff's motion to compel and warned the defendant of the potential for further sanctions. The defendant nevertheless continued its pattern of non-compliance until, on the final day of the discovery period, the information was disclosed. On these facts, the Federal Circuit affirmed the district court's judgment "deeming the concealed systems to infringe." *Id.* at 1345.

---

[54] Fed. R. Civ. P. 37(b)(2)(A)(ii); *see also Carroll v. Acme-Cleveland Corp.*, 955 F.2d 1107, 1115-16 (7th Cir. 1992) (party who refused to produce evidence in discovery appropriately precluded from relying on the evidence at trial); *Soderbeck v. Burnett County, Wis.*, 821 F.2d 446, 452 (7th Cir. 1987)(holding that when party fails to serve proper answers to another party's interrogatories the court may prohibit that party from introducing into evidence matters that were requested but not disclosed pursuant to Rules 37(b)(2)(B) and (d)).

[55] Fed. R. Civ. P. 37(b)(2)(C); *OrchestrateHR, Inc. v. Trombetta*, 178 F. Supp. 3d 476, 503 (N.D. Tex. 2016).

The discovery abuse here is even more egregious than in *Alexsam*, as PCC has presented evidence of false testimony and spoliation of evidence.  Although True Chem was not explicitly warned of the potential for sanctions, its ongoing, intentional pattern of concealment reveals willful misconduct and bad faith. The only reason True Chem turned over the PLC device was because it knew it had been caught.

The sanctions sought by PCC are just, and they are related to the claims at issue and the discovery sought.  PCC's discovery was aimed at determining whether, and to what extent, True Chem was automating and remotely monitoring and controlling its frac trailers, a key disputed issue in the case. The above sanctions directly relate to this issue. Further, PCC has asserted a claim of willful patent infringement against True Chem. A factor used to determine whether a party's conduct rises to the level of willful infringement is "whether defendant attempted to conceal its misconduct." *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1225 (Fed. Cir. 2006). Instructing the jury of True Chem's duty to preserve evidence and allowing the jury to determine whether True Chem violated that duty merely provides PCC with another avenue to prove that True Chem's conduct rose to the level of willful infringement.

The level of misconduct and apparent bad faith here is sufficiently egregious to merit more extreme sanctions, including the striking of pleadings or defenses and death penalty-type sanctions. *See, e.g.*, *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 801–02 (N.D. Tex. 2011) (holding that spoliation sanctions in the form of striking pleadings was necessary to remedy prejudice to plaintiff and deter future discovery abuse when Defendant concealed and deleted key evidence). The sanctions PCC requests are, therefore, the least severe punishment that could be entered and still be proportional to the misconduct and the prejudice True Chem's conduct caused PCC.

## CONCLUSION

PCC does not take the filing of a sanctions motion lightly. But this is not a garden-variety discovery fuss. The evidence PCC has just now uncovered reveals systemic bad-faith discovery abuse, repeated falsehoods and concealment, and spoliation. Such conduct should not unpunished, and the prejudice suffered by PCC should be remedied.

For the foregoing reasons, PCC moves the Court to impose the discovery sanctions requested above, and to award PCC any further relief to which it may be justly entitled.

24

Respectfully submitted,

Daniel Scardino
Texas State Bar No. 24033165
SCARDINO LLP
501 Congress Avenue, Suite 150
Austin, TX  78701
Tel.: (512) 443-1667
Fax: (512) 487-7606


Steve McConnico
Texas Bar No. 13450300
Paige Arnette Amstutz
Texas State Bar No. 00796136
Robyn Hargrove
Texas State Bar No. 24031859
SCOTT, DOUGLASS & MCCONNICO, LLP
303 Colorado Street, Suite 2400
Austin, TX 78701
Telephone: (512) 495-6300
Facsimile: (512) 495-6399
smcconnico@scottdoug.com
pamstutz@scottdoug.com
rhargrove@scottdoug.com

***Attorneys for Plaintiff***
***Performance Chemical Company***

## **CERTIFICATE OF CONFERENCE**

On this date, counsel for PCC contacted counsel for True Chem, who advised that True Chem opposes the relief sought by this Motion.

Robyn Bigelow Hargrove

## **CERTIFICATE OF SERVICE**

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I certify that, on March 22, 2021, all counsel of record who have appeared in this case are being served with a copy of the foregoing via the Court's CM/ECF system.

Robyn Bigelow Hargrove

26

4821-6276-3489