IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| TRUE CHEMICAL SOLUTIONS, LLC, | § § § | |
| *Plaintiff/Counter-Defendant* | § § | Civil Action No. 7:18-CV-00078-ADA |
| v. | § § | |
| PERFORMANCE CHEMICAL COMPANY, | § § § | **Jury Trial Demanded** |
| *Defendant/Counter-Plaintiff* | § § § § § | |

**PLAINTIFF TRUE CHEMICAL SOLUTION'S RESPONSE IN OPPOSITION TO
DEFENDANT PERFORMANCE CHEMICAL'S MOTION FOR SANCTIONS**

**I.      INTRODUCTION**

On March 22, 2021, Performance Chemical Company ("PCC") moved for sanctions against True Chemical Solutions ("True Chem") based on True Chem's failure to timely disclose relevant work done by B&H Industrial, Electrical, Construction and Maintenance, Inc. ("B&H") on True Chem's T-9 frac trailer ("the B&H Project").

True Chem does not dispute the basic facts of the B&H Project as recounted in PCC's motion: in the Spring of 2019, True Chem hired B&H to install a PLC/HMI component to automate True Chem's T-9 frac trailer. As part of this project, B&H subcontracted Ben Walter of Integ Automation to program the PLC/HMI. At the end of the summer, on August 22, 2019, True Chem successfully field tested the developed automation feature for the first time on a job. *See* Ex. D. Although the original intent of the B&H Project was to perform similar modifications on True Chem's other trailers, both B&H's superintendent, Josh Bittler, and Ben Walter have testified that they only worked on the T-9 trailer.

Unfortunately, the existence of the B&H Project, although known to True Chem, was not shared with its counsel at John & Morgan PC until January 20, 2021, after True Chem produced emails and invoices relating to the work performed on the project. Additionally, True Chem respectfully notes that it only recently hired the law firm of Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing PC ("AZA") in December of 2020 to assist its lead counsel in preparing this case for trial. As a result, AZA's first involvement came long after any of the alleged misstatements or omissions made in this case, and AZA had no knowledge of the B&H Project prior to its reference by PCC's counsel on February 5, 2021. *See* Dkt. 271, Ex. D (Decl. of Mr. Daniel Scardino) at ¶ 3 (identifying B&H and Ben Walter as "new third party witnesses with information and knowledge regarding True Chem's automation of its competing frac trailers"). Indeed, prior to March 24, 2021, AZA had not had any direct communications with any True Chem employee.

True Chem's failure to timely disclose the existence of the B&H Project was a mistake. By way of explanation—not justification—the disconnect between counsel and client stemmed from the fact that True Chem was not able to get the PLC to receive flow rate data and subsequently removed the PLC/HMI component from the T-9 trailer in late 2019. As a result, True Chem made the unilateral determination—which it was ***not*** permitted to do under the rules and was made without consulting counsel—that the project was not relevant to this lawsuit. Instead, when PCC's expert later inspected True Chem's trailers on January 16, 2020, the trailers were produced in their then-current state, and all that remained of the B&H Project in the T-9 trailer was the wiring raceway for the PLC/HMI installation and cables running from that raceway to the Graco pump controllers (which were still in the trailers along with the Graco pumps).

Recognizing the prejudice that PCC has suffered, True Chem has strived to accommodate PCC and to help put them back in the position they would have been in had the B&H Project been disclosed in a timely manner. For example, after PCC amended its witness list on February 5, 2021 to include B&H's corporate representative and Ben Walter, the parties agreed to depose those individuals and obtained third-party discovery from them. Similarly, True Chem has no objection to PCC's supplemental expert report on infringement, which PCC served on March 14, 2021 and specifically addresses the B&H Project. Lastly, True Chem produced the PLC/HMI component to PCC on March 18, 2021.

In the interest of transparency, True Chem first notified counsel at John & Morgan PC of the PLC/HMI's existence on January 20, 2021. Subsequently, on March 16, 2021, John & Morgan PC informed its co-counsel at AZA of the existence of the PLC/HMI. After an investigation of its background, True Chem produced the device to PCC two days later on March 18, 2021. Prior to informing AZA of its existence—and prior to PCC's service of its supplemental expert report on March 14, 2021—counsel at John & Morgan PC was under the mistaken belief that the PLC never

worked and was not used on a frac job for any customer. Due to True Chem's removal of the PLC/HMI from the T-9 trailer and the fact that PCC's expert was not able to inspect this component, True Chem will not raise any argument at trial or in any other proceeding that the PLC/HMI does not provide the automation required by the asserted claims or is not capable of communicating with client devices. Furthermore, as discussed below, True Chem will stipulate to the automation functionality of the PLC/HMI component.

Although True Chem understands that the Court may decide that further relief is warranted, for the reasons provided below, True Chem respectfully submits that the sanctions proposed by PCC go beyond this automation issue and beyond curing any prejudice. As a result, and in the interests of good faith, True Chem has proposed alternative measures that seek to: (a) resolve the technical circumstances of the B&H Project in PCC's favor; (b) provide PCC with avenues for impeachment at trial; and (c) cover the additional costs incurred by PCC.

Specifically, True Chem would stipulate to the following facts:

- In the Spring of 2019, True Chem hired B&H to work on True Chem's T-9 trailer.
- The purpose of the B&H work done for True Chem was to install a PLC/HMI in order to automate the T-9 trailer.
- The PLC/HMI installed in True Chem's T-9 trailer is "operable for automatically providing different fluid flows at remotely controllable pressures."
- The PLC/HMI installed in True Chem's T-9 trailer comprised communication hardware and software that allows it to communicate with a client device.
- The T-9 trailer had a successful first field test on a job on August 22, 2019.
- All frac jobs performed by True Chem after August 22, 2019 used the T-9 trailer.

These are significant stipulations that would resolve the functionality of the PLC in PCC's favor and bar True Chem from arguing that there were no networking or automation capabilities. Additionally, True Chem notes that it has **six other frac trailers** that are accused of infringement

3

in this case during the same time period. As a result, a stipulation that all jobs after and including the first successful field test on August 22, 2019 is entirely to True Chem's disadvantage—and entirely to PCC's advantage—by barring True Chem from making any argument that some of those jobs used other trailers. Accordingly, this stipulation would moot any concern about whether the PLC/HMI setup could have been duplicated into other trailers. These proposed measures are discussed in detail below.

## II.  ARGUMENT

### A.  The Technical Circumstances of the B&H Project

The configuration of the B&H Project is not in dispute. The Graco pumps were connected to the Graco pump controllers. The Graco pump controllers, in turn, were connected to the PLC. Specifically, PCC's expert has mapped the PLC as connecting to Port 4 on the Graco pump controllers. Importantly, during his inspection of the trailers in January of 2020, the Graco pumps and the Graco pump controllers were still present and the cable that would have connected the Graco pump controllers to the PLC was still connected to Port 4 of the Graco pump controllers.

As a result, True Chem respectfully submits that any sanction should only impact arguments as to the PLC/HMI and should not impact arguments as to the capabilities of the Graco pump controllers, which were present and inspected by PCC's own expert over a year ago.

#### 1.  PCC's Proposed Sanction #1 Conflates the PLC and the Controller.

The first sanction that PCC is seeking is a judicial finding "that the 'controller' elements of Claim 1 of the '452 Patent and Claim 1 of the '501 Patent are met with respect to the question of True Chem's infringement." *See* Dkt. 305 at 20. However, this incorrectly conflates the PLC with the Graco pump controller. In fact, during his deposition, PCC's own expert stated that the claimed controller corresponds to the Graco pump controller, not the PLC:

4

> Q. Let me ask it this way: Did you -- how would you characterize what Mr. McBride was calling the "pump controller" today?
> A. I would call it the "controller."
> Q. But that's the controller of the independent claims, correct?
> A. Yes.

Ex. A at 112:1-7 (Mar. 23, 2021 deposition transcript of Dr. Joseph Beaman).

As a result, PCC's request for a judicial finding that the "controller" elements are satisfied means that PCC is requesting a judicial finding that *the Graco pump controllers*—which PCC's own expert inspected over a year ago during the normal course of discovery—satisfy the claim language. That is an overreach that is not limited to either the PLC or the automation feature and that would eliminate a non-infringing argument that True Chem properly disclosed, that the parties took timely depositions on, and that PCC's own expert has had over a year to investigate.

The asserted claims require two important, but different, features: (a) "automatically providing different fluid flows at remotely controllable pressures" and (b) a controller in communication with the pumps and a network that allows for "remote monitoring and control." These two features are highlighted in the language below from each asserted patent:

**'452 Patent, Claim 1:**

k. a controller in communication with each pump of the plurality of pumps and a network to communicate with at least one client device for remote monitoring and control;

\*\*\*

o. a plurality of back pressure valves, each back pressure valve mounted to one of the first valves, wherein the automated water treatment trailer is operable for automatically providing different fluid flows at remotely controllable pressures related to fluid characteristics and specific gravity and pressure in the water pipe.

**'501 Patent, Claim 1:**

h. a controller in communication with each pump of the plurality of pumps, wherein the controller is configured to connect to a network to communicate with at least one client device for remote monitoring and control;

\*\*\*

l. a plurality of back pressure control regulators, each back pressure control regulator mounted to a respective one of the valves, wherein the automated water treatment trailer is operable for automatically providing different fluid flows at remotely controllable pressures related to fluid characteristics and specific gravity and pressure in a water pipe.

PCC's own expert, Dr. Joseph Beaman, agrees that the "automation" feature is different from the "remote monitoring" feature:

> Q. (BY MR. MCBRIDE) Sure. I am asking you if in your opinion is automated the same thing as remotely monitored and controlled?
> MR. SCARDINO: Objection to form.
> THE WITNESS: Well, you know, you don't have to be monitoring obviously to -- to -- you can have something that's automated, it's not monitored, if that's your question.
> Q. (BY MR. MCBRIDE) Okay. And would it be fair to say that the -- sort of the opposite, that you can have something that is remotely monitored but it's not automated?
> A. Yeah, you could certainly monitor something that wasn't automated.

Ex. A at 59:15-60:3. This is logical. For example, a dishwasher is automated, but most dishwashers cannot be remotely monitored. Conversely, a doctor may be able to remotely monitor a surgery using fiber optics but still have to manually perform the procedure. Both True Chem and PCC's own expert agree that the PLC/HMI goes to the *automation part* of the claims:

> So what was your intent when you drafted this -- this sentence, was it to suggest that the Graco controller has automation capability or that the PLC and the HMI --
> A. Yeah, that's what I was meaning. In my discussion with the Counsel here, you know, I didn't quite understand. I really meant the PLC and the HMI as being the automation part.

Ex. A at 114:14-21.

However, the first sanction that PCC is seeking is a judicial finding the controller elements are satisfied. In addition to the above problems, this is also an overreach because the controller provides for "remote monitoring and control" of the pumps. As stated in the patents and cited by the Court in its Claim Construction Order, "the controller receives information regarding pressure at each pump" and includes a "bidirectional connection [that] allows the user to receive information from the controller, *e.g.*, pressure for a specific pump which is pumping a chemical of

a specific gravity, and send commands, as needed, to the pumps via the controller." Dkt. 64 at 11-12. Based on this description, the Court stated that the claimed controller would have "the capability to: (1) Receive feedback from and control mechanical devices (pumps) and (2) Communicate with client devices over a network, possibly using wireless protocols." The following diagram illustrates this claimed capability:



For remotely *monitoring* the pumps, the controller receives feedback data (red arrow) from the pumps and communicates that feedback to a client device. For remotely *controlling* the pumps, the client device provides the controller with commands from the client device, and the controller can send control data (green arrow) to the pumps.

However, the Graco pump controllers—which were in the trailers at the time of PCC's inspection—do not contain automation software or the kind of network protocols that can be used to communicate with a client device. As a result, the B&H Project involved connecting the Graco pump controller to a PLC/HMI component. The PLC/HMI would provide the automation software and the network communication. The following diagram illustrates this relationship:



7

Importantly, the parties have long disagreed about whether the Graco pump controller is capable of providing "feedback" data from the pumps to the PLC. By way of illustration, in the diagram above, True Chem contends that there would be no "red feedback arrow" in between the Graco pump controller and the PLC because the Graco pump controller cannot *output* pressure data to the PLC. In other words, a client device could remotely control the pumps (via the green control arrows), but a client device could not remotely monitor the pumps because it cannot "receive feedback" from the pumps under the Court's claim construction order.



On this point, PCC's own expert agrees:

> Q. Okay. So you're not receiving feedback from the pump?
> A. No. This is not a feedback controller.

Ex. A at 72:21-23.

Although True Chem fully expects that PCC will disagree with the technical analysis of the Graco pump controllers, PCC should not be able to shortcut the merits of this dispute by using True Chem's failure to disclose an entirely different component of the trailer, the PLC/HMI.

As mentioned above, True Chem will stipulate that the B&H Project's PLC/HMI provides the automation required by the asserted claims and is capable of communicating with client devices. This is a significant sanction. As discussed above, automation is not only one of the two central aspects of the independent claims, but the patents are also both titled, "*Automated* Water Treatment Trailer for Processing Multiple Fluids Simultaneously." Similarly, the stipulation that

the PLC/HMI has networking hardware/software capable of connecting to a client device will remove any dispute about the features and functionality of the PLC/HMI component.

### 2. PCC's Proposed Sanction #3 is contrary to third-party testimony.

PCC's third proposed sanction seeks a jury instruction that "if it finds that True Chem automated one of its trailers via use of a PLC/HMI device, it may infer that True Chem has automated all of its trailers using that same type of device." Dkt. 305 at 21. However, on this issue, both Josh Bittler, B&H's superintendent of the B&H Project, and Ben Walter testified that they only ever worked on one trailer: the T-9 trailer.

> Q. Okay. Now, you testified earlier when questioned by Mr. Scardino that if the project went well, the intent was to create other similar trailers with the same setup, correct?
> A. Yes, sir.
> Q. Are you aware if any such trailers were created?
> A. No.
> Q. Okay. Did you ever load the software you created on any other trailers?
> A. No.

Ex. B at 77:20-78:5 (Mar. 19, 2021 deposition transcript of Mr. Ben Walter).

> Q. And did B&H ever install that software on any other True Chem trailer?
> A. No, sir. We only worked on one trailer that I remember.
> Q. Okay. And did B&H ever install a PLC or an HMI in any other True Chem trailer?
> A. No, sir.
> Q. Now, True Chem says that the trailer you worked on was the T9 trailer. Would you -- would you have any reason to disagree with that?
> A. No, sir.

Ex. C at 31:18-32:3 (Mar. 22, 2021 deposition transcript of Mr. Joshua Bittler).

But True Chem understands PCCs concern on this issue. During the deposition of Josh Bittler, PCC's counsel asked if it would have been possible for True Chem to have duplicated

9

B&H's work into the other trailers. Although True Chem did not recreate B&H's work in any other trailer, Josh Bittler testified that it would have been technically "possible" for True Chem to do this. As a result, and in the interest of acting in good faith, True Chem believes that an appropriate remedy would be to exclude any argument, testimony or evidence from True Chem that it did not duplicate B&H's work. In other words, the Jury should hear the testimony of Josh Bittler and Ben Walter and, if PCC wants to argue that it was still "possible" that the setup was duplicated into other trailers, True Chem will leave that unrebutted.

In contrast, PCC's proposed sanction goes beyond the testimony of third-parties and beyond its own expert's inspection of the trailers. Dr. Beaman had the opportunity to inspect each of the trailers in January of 2020. He saw and took pictures of the wiring in T-9 and testified that he does not recall seeing any similar wiring in any other trailer:

> Q. Okay. Did you see a similar wiring box with corresponding wires in any of the other True Chem trailers?
> A. I don't believe I did. I mean, I would have to go back and look at all the pictures again to confirm that, but I think that's correct.

Ex. A at 13:8-13. As a result, an inference that if one trailer had a PLC/HMI then all of the trailers had a PLC/HMI is at odds with Dr. Beaman's own inspection. Additionally, it would have the unintended effect of lessening the credibility of two neutral third-parties: the inference that if one trailer had a PLC/HMI than all of them did could be perceived as being contrary to the testimony of Ben Walter and Josh Bittler.

To the extent a sanction is warranted on this point, True Chem is proposing to stipulate that all of its frac trailer jobs after the completion of the B&H Project on August 22, 2019 used the T-9 trailer. This is a massive stipulation. True Chem has *six other frac trailers* that are accused of infringement in this case. As a result, a stipulation that all jobs after August 22, 2019 used the T-9

trailer is fundamentally not true and is entirely to True Chem's disadvantage—and entirely to PCC's advantage—by barring True Chem from making any argument that some of those jobs used other trailers. Accordingly, this stipulation would moot any concern about whether the PLC/HMI setup could have been duplicated into other trailers and would preserve the credibility of neutral third-parties who testified that they only worked on the T-9 trailer.

### 3. PCC's Proposed Sanction #6 is contrary to third-party testimony.

PCC's sixth proposed sanction seeks a jury instruction that "True Chem be prevented from using or referencing, in any way, the evidence recently uncovered from B&H, Ben Walter, Joshua Bittler, or the PLC/HMI device except in direct response to questions from PCC's counsel." Dkt. 305 at 21. True Chem is concerned about the scope and breadth of this proposed sanction and how it would apply to even the most basic of facts, such as *when* the B&H Project started. PCC seems to suggest that it could present evidence and argument that the B&H Project resulted in an infringing trailer, but simultaneously prohibit True Chem from telling the jury when the B&H Project started—i.e., when the period of infringement for that project would have begun. As a result, PCC's sanction poses the risk that the jury will reach conclusions that are directly contrary to neutral third-party testimony. Both Ben Walter and Josh Bittler testified that the PLC/HMI was programmed and installed in the spring/summer of 2019:

> Q. Okay. So during your second trip, did you load the software for the PLC and the HMI onto those devices?
> A. I did.
> ***
> Q. Okay. And when you talked about the second trip, you said it was in May, maybe June. That was also 2019, correct?
> A. Correct.

Ex. B at 26:4-7 and 28:2-5.

```
                All right.  Let's just -- let's just
start this way:  When is the first time you recall
working on the T9 trailer for True Chemical?
     A.   It was, I guess, about two years ago.  I
really don't remember the day or month.
     Q.   It was in 2019, though; is that right?
     A.   Yes, sir, I believe so.
     Q.   All right.  Would it have been about June of
2019 when you worked on the trailer?
     A.   I think it was in the summer, yes, sir.
     Q.   Okay.  And generally, what was the project that
B&H was doing for True Chem on the T9 trailer?
     A.   We were looking at putting in a -- or we --
we installed electrical for the HMI and a PLC.
```

Ex. C at 13:12-25.

Indeed, PCC's own sanctions motion agrees with this date and points to third-party evidence for corroboration: "[t]he documents produced by B&H on March 17, 2021 confirm that True Chem hired B&H to install a PLC/HMI component to automate True Chem's frac trailers *in the Spring and Summer of 2019*." Dkt. 305 at 9 (emphasis added).

As a result, to the extent PCC's proposed sanction gives it the ability to omit certain uncontested facts and mislead the jury into reaching an objectively incorrect conclusion—such as the B&H Project started in 2018 or 2017—the Court should reject this proposal.

As mentioned above, True Chem will stipulate that the B&H Project's PLC/HMI provides the automation required by the asserted claims and is capable of communicating with client devices. As a result, the functionality of the PLC/HMI will not be in dispute. Similarly, True Chem is willing to stipulate that all of its frac trailer jobs after the completion of the B&H Project on August 22, 2019 used the T-9 trailer. This would moot any concern about whether the PLC/HMI setup could have been duplicated into other trailers. True Chem respectfully submits that those stipulations together would cure any prejudice suffered by PCC.

      **B.**    **True Chem's own stipulations provide PCC with avenues of impeachment.**

As part of the above stipulations, PCC will now have avenues to impeach True Chem's employees on their knowledge and use of PLCs.  To the extent any True Chem witness denied ever using or installing a PLC or denied ever having an automated trailer, the stipulations can and almost certainly will be used by PCC to impeach their credibility.  Similarly, the stipulations will permit PCC to challenge the dismantling of the T-9 trailer, and PCC will be able to ask True Chem's witnesses about the timing of their production of the PLC/HMI component and its unavailability for a prior inspection and make corresponding arguments to the jury about the reasons and motivations.

However, True Chem respectfully believes that statements made by its counsel to the Court should not come in for a host of reasons.  PCC itself states in its motion that "[t]o be clear, PCC is not accusing True Chem's counsel of deliberately misleading the Court or engaging in spoliation."  Dkt. 305 at 8.  True Chem's counsel can assure the Court that this is correct and that all misstatements and omissions were made without any knowledge of the B&H Project.  As a result, allowing PCC to use those statements would be seen as attacking the credibility of True Chem's counsel, which would have a devastating effect on the jury and cause them to doubt the arguments that we, as counsel, would make at trial simply because we are making them.  True Chem's counsel understands and accepts that PCC can and will seek to impeach True Chem and its employees, but attacking the credibility of attorneys before a jury would be overly prejudicial and is directly contrary to PCC's assurance that it is not accusing True Chem's counsel of deliberate impropriety.

      **C.**      **True Chem is willing to cover certain additional costs imposed on PCC.**

As detailed above, True Chem is committed to putting PCC in the best possible position it could have been in had the B&H Project been disclosed in a timely manner.  In addition to resolving technical issues concerning the PLC/HMI component in PCC's favor, True Chem's stipulations will provide avenues for PCC to impeach the credibility of True Chem's witnesses.

13

However, True Chem recognizes that its mistake has also added to PCC's cost of litigation, and specifically added costs that would have been avoided or dramatically reduced had the B&H Project been disclosed during discovery. For example, True Chem is willing to pay for PCC's costs associated with the drafting of Dr. Beaman's supplemental report and his subsequent deposition if the Court finds that this is warranted.

### III. CONCLUSION

True Chem recognizes that it should have fully disclosed the B&H Project and the resulting trailer operation in a timely manner during discovery. True Chem also recognizes that it should have communicated its existence to counsel and allowed counsel to make the decision on whether to disclose it to PCC. Given the prejudice suffered by PCC, True Chem is committed to taking steps to cure that prejudice and to put PCC in the best possible position it could have been had the B&H Project been properly disclosed. With that goal, True Chem has proposed stipulations that would resolve the functionality of the PLC/HMI in PCC's favor and resolve any uncertainty about the breadth of the project in PCC's favor. Specifically, True Chem would stipulate as follows:

- In the Spring of 2019, True Chem hired B&H to work on True Chem's T-9 trailer.
- The purpose of the B&H work done for True Chem was to install a PLC/HMI in order to automate the T-9 trailer.
- The PLC/HMI installed in True Chem's T-9 trailer is "operable for automatically providing different fluid flows at remotely controllable pressures."
- The PLC/HMI installed in True Chem's T-9 trailer comprised communication hardware and software that allows it to communicate with a client device.
- The T-9 trailer had a successful first field test on a job on August 22, 2019.
- All frac jobs performed by True Chem after August 22, 2019 used the T-9 trailer.

As detailed above, these are significant stipulations that would resolve the functionality of the PLC in PCC's favor and bar True Chem from arguing that there were no networking or

14

automation capabilities. Additionally, True Chem notes that it has ***six other frac trailers*** that are accused of infringement in this case during the same time period. As a result, a stipulation that all jobs after and including the first successful field test on August 22, 2019 is entirely to True Chem's disadvantage—and entirely to PCC's advantage—by barring True Chem from making any argument that some of those jobs used other trailers. Accordingly, this stipulation would moot any concern about whether the PLC/HMI setup could have been duplicated into other trailers.

By proposing these stipulations, True Chem hopes that it will cure any prejudice and demonstrate its good faith efforts to remedy its discovery violation.

Dated: March 25, 2021

Respectfully submitted,

*/s/ Jaison C. John*
Jaison C. John
State Bar No. 24002351
jjohn@johnandmorganlaw.com
Terry D. Morgan
State Bar No. 14452430
tmorgan@johnandmorganlaw.com
JOHN & MORGAN, P.C.
6464 Savoy Dr., Suite 600
Houston, TX 77036
Telephone: (713) 934-4069
Facsimile: (713) 934-7011

Masood Anjom
Texas Bar No. 24055107
manjom@azalaw.com
Justin Chen
Texas Bar No. 24074024
jchen@azalaw.com
Louis Liao
Texas Bar No. 24109471
lliao@azalaw.com
AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI
    & MENSING P.C.
1221 McKinney Street, Suite 2500
Houston, TX 77010
Telephone: (713) 655-1101
Facsimile: (713) 655-0062

James W. Essman
State Bar No. 00788771

15

        jessman@shaferfirm.com
        Miles R. Nelson
        State Bar No. 14904750
        mnelson@shaferfirm.com
        SHAFER, DAVIS, O'LEARY & STOKER
        700 North Grant, Ste. 201
        P.O. Drawer 1552
        Odessa, TX 79760-1552
        Telephone: (432) 332-0893
        Facsimile: (432) 333-5002

        **ATTORNEYS FOR PLAINTIFF AND**
        **COUNTER DEFENDANT,**
        **TRUE CHEMICAL SOLUTIONS, LLC**

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

I certify that Exhibit D is authorized to be filed under seal pursuant to the Protective Order entered in this case.

*/s/ Jaison C. John*
Jaison C. John

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was filed electronically in compliance with Local Rules CV-5(b) on March 25, 2021. As such, this document was served on all counsel of record pursuant to Local Rules CV-5(b)(1) and the Federal Rules of Civil Procedure.

*/s/ Jaison C. John*
Jaison C. John
